# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the
Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

**FEDERAL JUDICIAL CENTER**

**NATIONAL RESEARCH COUNCIL**
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

EXHIBIT C

**THE NATIONAL ACADEMIES PRESS  500 Fifth Street, N.W.  Washington, DC 20001**

The Federal Judicial Center contributed to this publication in furtherance of the Center's statutory mission to develop and conduct educational programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

The development of the third edition of the *Reference Manual on Scientific Evidence* was supported by Contract No. B5727.R02 between the National Academy of Sciences and the Carnegie Corporation of New York and a grant from the Starr Foundation. The views expressed in this publication are those of the authors and do not necessarily reflect those of the National Academies or the organizations that provided support for the project.

International Standard Book Number-13: 978-0-309-21421-6
International Standard Book Number-10: 0-309-21421-1

Library of Congress Cataloging-in-Publication Data

Reference manual on scientific evidence. — 3rd ed.
   p. cm.
 Includes bibliographical references and index.
 ISBN-13: 978-0-309-21421-6 (pbk.)
 ISBN-10: 0-309-21421-1 (pbk.)
 1. Evidence, Expert—United States. I. Federal Judicial Center.
 KF8961.R44 2011
 347.73'67—dc23
                                    2011031458

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, http://www.nap.edu.

Copyright 2011 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

EXHIBIT C

# THE FEDERAL JUDICIAL CENTER

The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States, with the mission to "further the development and adoption of improved judicial administration in the courts of the United States." By statute, the Chief Justice of the United States chairs the Federal Judicial Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and seven judges elected by the Judicial Conference.

The Center undertakes empirical and exploratory research on federal judicial processes, court management, and sentencing and its consequences, often at the request of the Judicial Conference and its committees, the courts themselves, or other groups in the federal system. In addition to orientation and continuing education programs for judges and court staff on law and case management, the Center produces publications, videos, and online resources. The Center provides leadership and management education for judges and court employees, and other training as needed. Center research informs many of its educational efforts. The Center also produces resources and materials on the history of the federal courts, and it develops resources to assist in fostering effective judicial administration in other countries.

Since its founding, the Center has had nine directors. Judge Barbara J. Rothstein became director of the Federal Judicial Center in 2003

**www.fjc.gov**

EXHIBIT C

*Reference Manual on Scientific Evidence*

## B. Engineering Disciplines and Fields of Practice

One can think of engineering in terms of its various disciplines as they relate to the academic enterprise and the names of departments or degrees with which they are associated, for instance electrical engineering or chemical engineering. One also can consider the technological context in which engineering is practiced as in the case of nanotechnology, aerospace engineering, biotechnology, green buildings, or clean energy.

In the same sense that some struggle trying to identify the differences and likenesses between science and engineering, others pursue a different kind of identity crisis by staking out their turf through title assignment. It is pointless to list titles of engineering disciplines because such a list would be incomplete and not stand the test of time as disciplines come and go, merge, diverge, and evolve. Bioengineering, biochemical engineering, molecular engineering, nanoengineering, and biomedical engineering are relative newcomers and have emerged in response to discoveries in the sciences that underlie biological and physiological processes. Software engineering and financial engineering are two other examples of disciplines that have developed in recent years.

In the end, it is not the names of disciplines that are critical, they being no more than labels. Names of disciplines are at best imprecise descriptors of the activities taking place within those disciplines and ought not to be relied on for accurate characterizations of pursuits that may or may not be occurring within them.

## C. Cross-Disciplinary Domains

Whereas engineering disciplines are often associated with their scientific roots (i.e., mechanical engineering and physics, electrical engineering and physics, chemical engineering and chemistry, bioengineering and biology, biomedical engineering and physiology) some lack this kind of direct association (i.e., aerospace engineering, materials engineering, civil engineering, polymer engineering, marine engineering). Indeed, there are software engineers, hardware engineers, financial engineers, and management engineers. There is no shortage of adjectives here.

Nonetheless, these and many other such discipline titles have meant or mean something to someone, and new ones are emerging all the time as the historical barriers that once separated and defined the "classic" engineering disciplines continue to disintegrate and become a thing of the past. No longer can we rely on discipline names to inform us of specific enterprises and activities. There is, after all, nothing wrong with this as long as it is recognized that they ought not be used as reliable descriptors to subsume all possible activities that might be occurring within a domain. One must reach into a domain and investigate what kind of engineering is being conducted and resist the temptation to draw conclusions based on name only. Doing otherwise could easily lead to an unreliable and inaccurate characterization.

EXHIBIT C

*Reference Guide on Engineering*

To provide a tangible example, consider cases involving personal injury in which central questions often revolve around the specifics of how a particular trauma occurred. In situations where proximate cause is an issue, the trier of fact can benefit from a thorough understanding of the mechanics that created an injury. The engineering and scientific communities are increasingly called on to provide expert testimony that can assist courts and juries in coming to this type of understanding. What qualifies an individual to offer expert opinions in this area is often a matter of dispute. As gatekeepers of admission of scientific evidence, courts are required to evaluate the qualifications of experts offering opinions regarding the physical mechanics of a particular injury. As pointed out earlier, however, this gatekeeping function should not rise and fall on whether a person is referred to or refers to himself or herself as a scientist or engineer.

Specifically, one cross-disciplinary domain deals with the study of injury mechanics, which spans the interface between mechanics and biology. The traditional role of the physician is the diagnosis (identification) of injuries and their treatment, not necessarily a detailed assessment of the physical forces and motions that created injuries during a specific event. The field of biomechanics (alternatively called biomechanical engineering) involves the application of mechanical principles to biological systems, and is well suited to answering questions pertaining to injury mechanics. Biomechanical engineers are trained in principles of mechanics (the branch of physics concerned with how physical bodies respond to forces and motion), and also have varying degrees of training or experience in the biological sciences relevant to their particular interest or expertise. This training or experience can take a variety of forms, including medical or biological coursework, clinical experience, study of real-world injury data, mechanical testing of human or animal tissue in the laboratory, studies of human volunteers in non-injurious environments, or computational modeling of injury-producing events.

Biomechanics by its very nature is diverse and multidisciplinary; therefore courts may encounter individuals being offered as biomechanical experts with seemingly disparate degrees or credentials. For example, qualified experts may have one or more advanced degrees in mechanical engineering, bioengineering, or related engineering fields, the basic sciences or even may have a medical degree. The court's role as gatekeeper requires an evaluation of an individual's specific training and experience that goes beyond academic degrees. In addition to academic degrees, practitioners in biomechanics may be further qualified by virtue of laboratory research experience in the testing of biological tissues or human surrogates (including anthropomorphic test devices, or "crash-test dummies"), experience in the reconstruction of real-world injury events, or experience in computer modeling of human motion or tissue mechanics. A record of technical publications in the peer-reviewed biomechanical literature will often support these experiences. Such an expert would rely on medical records to obtain information regarding clinical diagnoses, and would rely on engineering and physics training to understand the mechanics of the specific event that created the injuries. A practitioner whose expe-

901

EXHIBIT C

*Reference Manual on Scientific Evidence*

rience spans the interface between mechanics (i.e., engineering) and biology (i.e., science), considered in the context of the facts of a particular case, can be of significant assistance in answering questions pertaining to injury mechanism and causation.

This example illustrates the futility of trying to untangle engineering from science and vice versa and to the inappropriateness of using semantics, dictionary definitions, or labels (i.e., degree names) to parse, dissect, or portray the intellectual activities of an expert witness. In the end, it is their background and experience that are the dominant defining factors—not whether they are a scientist and/or an engineer and not by the titles they hold.

## II. How Do Engineers Think?

### A. Problem Identification

Although a somewhat overworked part of our lexicon, it is indeed the case that "necessity is the mother of invention." Engineering breeds a culture of technological responsiveness. All the "science" explaining a solution to a problem need not be known before an engineer can solve a problem.

Take steam engines, for example. Their history goes back several thousand years and their utility forged the beginning of the industrial revolution late in the seventeenth century. It was not until the middle of the nineteenth century that the science of thermodynamics began to gain a firm ground and offer explanations for the how and why of steam power.[6] In this instance, technology came first—science second. This, of course, is not always the case, but demonstrates that one does not necessarily precede the other and notions otherwise ought to be discarded. So here the problem was one of wanting to produce mechanical motions from a heat source, and engineers designed and built systems that did this even though the science base was essentially nonexistent.

To reinforce the point that technology can precede science, consider the design of the shape of aircraft wings. This, of course, was driven by the desire of humans to fly, a problem already solved in nature since the time of the dinosaurs but one that had eluded humankind for tens of thousands of years. Practical solutions to this problem began to emerge with the Wright brothers' first motive-powered flight and continued into the twentieth century before the "science" of fluid flow over wing structures had been fully elucidated. Once that happened, wings could be designed to reduce drag and increase lift using a set of "first principles" rather than relying solely on the results of empirical testing in wind tunnels and prototype aircraft.[7]

---

6. Pierre Perrot, A to Z of Thermodynamics (1998).
7. The pioneering aerodynamicist Walter Vincenti provides a detailed and fascinating account of this. *See* Vincenti, *supra* note 5, ch. 2; *see also* John D. Anderson, *Ludwig Prandtl's Boundary Layer*, Physics Today, December 2005, at 42–48.

EXHIBIT C

*Reference Manual on Scientific Evidence*

nonetheless may not be allowed to testify based on the substantive law applicable to such products.[66]

For example, industrial engineers, or engineers educated in human factors, may have training that allows them not only to testify when warnings are necessary from an engineering perspective (recall the discussion above about the design process), but also about the efficacy of warnings, and development of risk communications including text, pictures, auditory, or visual signals.

### 4. Other issues

Issues regarding the sale and marketing of products often concern promises made regarding the expected performance of the product, including both the positive results that a product is able to achieve and, especially, what possible harm that a product may cause. The efficacy of a product may be proved by a straightforward comparison between premarket data on product performance and sales and marketing claims, and engineers may provide helpful testimony regarding the interpretation of such data. There may be a dispute about whether the claims made about the product's safety exceeded the testing results that had been obtained for the product or led to a hazardous situation because the product was not properly tested. These may also be the subject of appropriately qualified engineering testimony.

Common personal injury cases may also present issues on which engineering testimony may be helpful. Such disputes often turn on testimony as to how a particular trauma occurred. Our discussion of biomechanical engineering highlights some of these issues.[67] In a car accident case, properly qualified engineers may provide opinion testimony regarding how an accident occurred, including reconstructing the conduct of each of the parties and how that conduct affected the accident. In a slip-and-fall case, engineering testimony can concern such basic issues as why the injured person slipped and what could have been done to prevent it.

In addition to the above, engineers may also testify about various aspects of a party's damages and give an opinion about whether those alleged damages were caused by the conduct in question. Testimony about causation in a products dispute often involves both factual and legal questions. Through experience, training, and activities in the case, engineers may have the ability to understand the interrelationship between events and thus can provide helpful testimony on whether the asserted damages had a relationship to the asserted misconduct so as to have

---

66. *See* Pineda v. Ford Motor Co., 520 F.3d 237 (3d Cir. 2008) (metallurgical engineer permitted to testify that safety manual should have contained warning about glass failure in SUV); Michaels v. Mr. Heater, Inc., 411 F. Supp. 2d 992 (W.D. Wis. 2006) (human factors engineering expert allowed to testify about the adequacy of product warning); Nesbitt v. Sears, Roebuck & Co., 415 F. Supp. 2d 530 (E.D. Pa. 2005) (expert with practical experience as engineer allowed to testify that the plaintiff would have responded to an additional warning); Santoro v. Donnelly, 340 F. Supp. 2d 464 (S.D.N.Y. 2004) (mechanical engineer allowed to testify about adequacy of warnings for fireplace heater).

67. *Supra* Section I.C.

942

EXHIBIT C

*Reference Guide on Engineering*

been "caused" by it.[68] But issues regarding the standard to apply for the sufficiency of causal proof may be both scientific and legal issues. Thus, the adequacy or admissibility of an engineer's opinion on causation will be evaluated in light of the law, as well as the adequacy of the science that forms the basis for the opinion.[69]

Situations where property damages are asserted may pose special problems on which engineering testimony may be appropriate. For example, determining whether a product problem is an isolated occurrence or whether it is part of a widespread product problem may be difficult to resolve in the absence of engineering testing and analysis, which aims at determining a product defect and a product breakdown process.

## B. Special Issues Regarding Proof of Product Defect

Although the definition of what is defective may be the subject of a jury instruction at trial,[70] proof of a product defect may involve identifying key facts that

---

68. *See, e.g.,* Nemir v. Mitsubishi Motors Corp., 381 F.3d 540 (6th Cir. 2004) (automotive safety engineer allowed to testify that defective seatbelt latching mechanism caused plaintiff's injuries); Babcock v. General Motors, 299 F.3d 60 (1st Cir. 2002) (structural and mechanical engineer allowed to give testimony about impact speed, cause of injuries, how the product allegedly ultimately failed, and testing procedures for the product); McCullock v. H.B. Fuller Co., 61 F.3d 1038 (2d Cir. 1995) (engineer allowed to testify regarding whether plaintiff was within "breathing zone" for hot-melt glue in workplace); Perez v. Townsend Eng'g Co., 545 F. Supp. 2d 461 (M.D. Penn. 2008) (engineer allowed to testify that product was defective, that defect caused plaintiff's injury, and that alternative design would have prevented injury); Farmland Mut. Ins. Co. v. AGCO Corp., 531 F. Supp. 2d 1301 (D. Kan. 2008) (electrical engineer allowed to testify about cause of farm equipment fire); Phillips v. Raymond Corp., 364 F. Supp. 2d 730 (N.D. Ill. 2005) (biomechanical engineer testified as to the mechanics of plaintiff's injury resulting from allegedly defective forklift); Tunnell v. Ford Motor Co., 330 F. Supp. 2d 731 (W.D. Va. 2004) (engineer allowed to testify there was an absence of evidence that the accident was caused by electrical arcing); Figueroa v. Boston Scientific Corp., 254 F. Supp. 2d 361 (S.D.N.Y. 2003) (expert with substantial experience, education, and knowledge in engineering field allowed to testify about cause of damage to plaintiff); Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470 (D.N.J. 2002) (expert in forensic and safety engineering, among other subjects, allowed to testify that bicycle seat caused the plaintiff's erectile dysfunction); Traharne v. Wayne Scott Fetzer Co., 156 F. Supp. 2d 690 (N.E. Ill. 2001) (electrical engineer allowed to testify about cause of deceased's electrocution); Bowersfield v. Suzuki Motor Corp., 151 F. Supp. 2d 625 (E.D. Pa. 2001) (engineer allowed to testify about causation of automobile passenger's injuries).

69. *See generally* Margaret A. Berger, The Admissibility of Expert Testimony, in this manual; *see also* Michael D. Green et al., Reference Guide on Epidemiology, Section V, in this manual.

70. Restatement (Third) of Torts § 2 (1998) provides that the general definition of a product defect is as follows:

> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
> (a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;
> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor,

EXHIBIT C