1

2

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

_____

                                    )
RAYA NSHEIWAT,                      )
                                    )    CASE NO. 3:20-cv-64
        Plaintiff,                  )
                                    )
    vs.                             )    TRANSCRIPT OF MOTION
                                    )    HEARING PROCEEDINGS
                                    )
WALMART, INC.,                      )
                                    )
        Defendant.                  )

_____

                              COURTROOM 455, FOURTH FLOOR
                              U.S. COURTHOUSE
                              123 East Walnut Street
                              Des Moines, Iowa 50309
                              Thursday, July 13, 2023
                              9:30 a.m.


BEFORE:  THE HONORABLE HELEN C. ADAMS, CHIEF MAGISTRATE JUDGE

                    Chelsey Wheeler, CSR, RPR, FCRR
                    United States Courthouse
                    123 East Walnut Street
                    Des Moines, IA 50309

```
 1   APPEARANCES:

 2   For the Plaintiff:        GARY P. HOLLANDER
                               Aronberg, Goldgehn, David & Garmisa
 3                             330 North Wabash Avenue, Suite 1700
                               Chicago, IL 60611
 4
                               CANDY K. PASTRNAK
 5                             Pastrnak Law Firm PC
                               313 West Third Street
 6                             Davenport, IA 52801

 7                             CASEY C. KANNENBERG
                               Sharuzi Law Group, Ltd.
 8                             518 17th Street, Suite 270
                               Denver, CO 80202
 9

10   For the Defendant:        PATRICK McDONNELL
                               McDonnell & Associates PC
11                             860 First Avenue, Suite 5B
                               King of Prussia, PA 19406
12
                               ALEXANDRA GALBRAITH
13                             Lederer Weston Craig PLC
                               4401 Westown Parkway, Suite 212
14                             West Des Moines, IA 50266

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              (In open court with counsel and the parties present

3     via video conference.)

4              THE COURT:  Please be seated.

5              MR. McDONNELL:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              All right.  Good morning.  We are here in Nsheiwat v.

8     Walmart, Inc.  That is Civil Case 3:20-cv-64.

9              Let's do roll call.  Let's do roll call on behalf of

10    the plaintiff first.

11             MR. HOLLANDER:  Good morning, Your Honor.  Gary

12    Hollander, H-o-l-l-a-n-d-e-r, on behalf of Plaintiff.

13             MR. KANNENBERG:  Casey Kannenberg also on behalf of

14    Plaintiff.

15             MS. PASTRNAK:  Candy Pastrnak also on behalf of

16    Plaintiff.

17             THE COURT:  All right.  And then on behalf of --

18             MR. McDONNELL:  Patrick McDonnell on behalf of --

19             THE COURT:  Go ahead, on behalf of the defendant.

20             MR. McDONNELL:  Patrick McDonnell on behalf of the

21    defendant.

22             MS. GALBRAITH:  Alexandra Galbraith on behalf of the

23    defendant, Your Honor.

24             THE COURT:  All right.  Thank you.

25             I do have a court reporter with me, so, again, as we

1    have done before, if you would state your name before you speak

2    each time so we make sure we get a clear record, and don't talk

3    over each other or me, and I will do the same, again, so we can

4    get a clear record.

5            Okay.  I set a hearing pursuant to docket No. 187.  We

6    set a hearing on docket No. 181, and that is the motion for

7    protective order regarding Defendant's investigation, and that

8    had a request for expedited relief.  That was filed on July 7

9    of 2023.  And a response to that was filed by the defendant on

10   July 11 of 2023.  That's in the court's records as document

11   190.

12           So that's what the hearing originally was with respect

13   to.  I did have a text message entered yesterday afternoon just

14   asking the lawyers to be prepared to the extent I had questions

15   about three additional motions.  The first one is document 171,

16   which is now -- because it really was a motion, is now what's

17   called motion re Plaintiff's deposition.  It was filed as a

18   status report by the defendant.

19           And document 175, which is a motion to conduct a site

20   survey.  That was filed on July 5 by the plaintiff.  And then

21   also document 176, which was a motion for extension of certain

22   deadlines.  That was also filed by the plaintiff, and that was

23   filed by the plaintiff on July 5.

24           I do note for the record that I have received

25   responses from the defendant to both 175 and 176.  Those are in

1    the court's docket as 189 that responds to 175, the motion to

2    conduct a site survey; and then 188, that is a response to the

3    motion for extension of time.

4        And then it's my understanding that late yesterday

5    afternoon Plaintiff filed a response to what I am referring to

6    now as 181, which is the -- excuse me -- filed a response to

7    171, which is what I am referring to as the motion regarding

8    Plaintiff's deposition, previously identified as being a status

9    report regarding Plaintiff's deposition.

10       All right.  What I would like to do is start with the

11   motion for protective order regarding the defendant's

12   investigation.  I have had a chance to review the filings, both

13   181 and 190, that were filed with the Court relating to that

14   particular motion.

15       I guess a couple of questions I want to start with,

16   and it will be directed to the plaintiff since it's the

17   plaintiff's motion, and the first question is:  What specific

18   relief are you seeking from the Court?  What is it you actually

19   want me to do?

20       And then I would like to have Plaintiff identify for

21   me what evidence they have that the defendant's investigator

22   engaged in any harassing behavior or invasive investigation

23   tactics.  And there were several that were described in the

24   motion, including opening mailboxes and rifling through mail.

25   I didn't see any evidence of that in the information I had so

1    far.  Scaring multiple individuals with harassing and abusive

2    threats, taking pictures of residences, and then disturbing

3    peace at the Autotech facility.

4         So I would like to have some further explanation from

5    the plaintiff as to exactly what they think that behavior was

6    and what evidence or proof they have related to that.

7         And the last main question I would like to ask the

8    plaintiff to start with is:  What's the status of the police

9    report that was filed?  It appears to have been filed by

10   Mr. Kumar, Vikram Kumar, from the information I have in the

11   record, and so I would like some specific information about

12   that.  That's what I would like you to focus on in your time

13   this morning.

14        Who is going to make the argument on behalf of

15   Plaintiff?

16        MR. KANNENBERG:  Casey Kannenberg, Your Honor.

17        THE COURT:  All right.  Mr. Kannenberg.

18        MR. KANNENBERG:  Yes.

19        THE COURT:  Did we have someone else who just joined

20   us?

21        MR. KANNENBERG:  I believe Mr. Vikram Kumar and

22   Shalabh Kumar are also on the Zoom meeting as well.  And Vikram

23   Kumar, in particular, is here in case the Court would have any

24   questions, specific factual questions, with respect to the

25   items asserted in the motion for protective order.

1           THE COURT:  All right.

2           MR. KANNENBERG:  To address your --

3           THE COURT:  Just a second.  I would like them to turn

4    on their camera so the Court can observe them along with the

5    lawyers.

6           MR. KANNENBERG:  Okay.

7           THE COURT:  Okay.  Whenever you're ready,

8    Mr. Kannenberg, you can go ahead.

9           MR. KUMAR:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. KANNENBERG:  Okay.  Addressing your first point,

12   you know, what we're asking for specifically is for -- it just

13   needs to stop.  You know, Plaintiff acknowledges and the Court

14   acknowledges that there was merit to Walmart, you know,

15   examining AVG, EMS, and the relationship with Plaintiff, which

16   is why the Court granted the subpoenas to ADP and the Barker

17   subpoena, to which Plaintiff's have produced thousands of pages

18   of records to Walmart so that they could verify the legitimacy

19   of these enterprises and the records produced thereto.

20          And now they have a team of investigators that have

21   descended upon Davenport, and they're harassing witnesses.  And

22   I'll talk about that more in a bit, but at this point the

23   proportionality has been far exceeded from what the discovery

24   needs are present.

25          So that is -- item No. 1 is we would just like it to

1    stop.  But at the very least, we would like it -- to the extent

2    these investigations are continued and ongoing, we believe a

3    court order prohibiting them from going through witnesses'

4    mailboxes, taking photographs of their private residences,

5    engaging in questioning tactics that are specifically designed

6    to scare and harass these people.

7            And Your Honor asked for what proof.  Again,

8    Mr. Vikram Kumar, who is on this, can talk more about the

9    conversations that have been brought to him by these people who

10   have felt harassed and scared based on the manner in which

11   these investigators are conducting their investigation.

12           So to the extent the Court permits them to continue to

13   engage in these investigations, they should do so using

14   reasonable investigation tactics at reasonable hours of the

15   day.

16           And, again, Your Honor, this motion was filed because

17   these employees were approaching the Kumars because they felt

18   scared.  This was not the other way around, contrary to the

19   argument raised by Walmart's counsel.

20           You know, Mr. Vikram Kumar and Shalabh Kumar were not

21   approaching any of these witnesses telling them not to speak

22   with the investigators.  It is exactly the opposite.  They feel

23   they are being harassed.  They are feeling scared based on the

24   tactics that these investigators are using.

25           I have been informed that these people have been in an

1   emotional state that has impaired their ability to work at that

2   factory in Bettendorf, so at the end of the day, that needs to

3   stop.  They need to not engage in tactics that are designed to

4   harass people who are not even going to be called as witnesses

5   at trial.

6        And I think we outlined in our affidavit specific

7   tactics that these investigators have been using to try to

8   intimidate these witnesses, including going through their mail

9   and, in some cases, going into -- to their residences between 9

10  and 11 p.m.  I understand that the affidavit of Ms. Le was not

11  outside of a reasonable hour, but other witnesses have been

12  approached outside of those hours.

13        I wasn't personally present at any of these

14  witnesses' -- nobody from Plaintiff was allowed to participate

15  in any of these interviews, so I can't speak to what they were

16  specifically doing.  All I can speak to is that they have felt

17  harassed, scared, intimidated and have brought those concerns

18  to the Kumars.

19        THE COURT:  Mr. Kannenberg, what's the status of the

20  police report?

21        MR. KANNENBERG:  Mr. Vikram Kumar filed the police

22  report.  I know Defendant suggested in the pleadings that

23  Mr. Shalabh Kumar filed the report, but it was actually

24  Mr. Vikram Kumar.  He filed an incident report after having

25  received numerous complaints from his employees based on these

1   tactics.

2          My understanding is that that was filed.  I don't

3   believe it was dismissed without any investigation.  My

4   understanding is that the police department is keeping it on

5   file, and if there are any further harassing complaints based

6   on the investigators' tactics, there will be follow-up at that

7   time.

8          THE COURT:  All right.  Let's stop there, and I am

9   going to turn to Mr. McDonnell.

10          Mr. McDonnell, a couple questions for you:  Number

11   one, is the investigation complete; number two, what's your

12   understanding of the police report status; and then, number

13   three, can you address your understanding of what -- A, how

14   many investigators are we talking about; B, what is it the

15   investigators are doing?

16          And I know that you've provided me with an affidavit

17   from one of the investigators.  I believe it's Mr. Stonehouse,

18   if I've got the name correct in here.

19          So if you could respond to those questions, I would

20   appreciate it.

21          MR. McDONNELL:  Sure, Your Honor.  There were 50 -- I

22   think -- I believe there were 50 people that were identified as

23   working for EMS at the time, either 50 or 57.  I'm not quite

24   sure.  There were no phone numbers provided for them, so the

25   first thing the investigator tried to do was find contacts or

1   ways to reach out to them.  They then divvied up the 50

2   employees.  They are not all located in Davenport or

3   Bettendorf.

4          Since Mr. Stonehouse was the one that was impugned, I

5   got an affidavit from him, but I believe there were three

6   people in the Quad Cities that went out with the same sort of

7   script that I attached to our motion -- our motion response,

8   which is these are the questions you're supposed to ask.  They

9   were taken directly from the expert report.  They were taken

10  directly from Vikram Kumar's letter about what the plaintiff

11  did, and the question in this case was, was she physically

12  hiring and training the employees, and did any of them know

13  her, and had she trained or hired them.

14          And I think the affidavit of Ms. Le is essentially a

15  self-indictment, which is that this woman allegedly was

16  trained -- according to the Kumars, Plaintiff was supposed to

17  have trained all these people, and she had no idea who she was,

18  and she provided an affidavit to that effect.

19          And that's the issue, Judge, is was the plaintiff

20  physically at the plant hiring and training people.  And that's

21  what we asked them to do, and the investigator -- if the

22  employee says, yes, she was actively involved, she was integral

23  to my training, this is what she did, those people would be

24  important witnesses both to confirm that contention.

25          And the opposite has happened, which is that everybody

1    interviewed so far has said that she was not -- she didn't

2    train them and she wasn't physically there, which is what we

3    suggested.

4              So as far as the investigation, there were lots of

5    people obviously that were contacted.  I think there were

6    probably maybe as many as 11 or 12 that actually spoke to

7    investigators and agreed to talk to them out of the 50.  And as

8    soon as the police got involved, Mr. Stonehouse talked to the

9    police, he was advised that -- once he heard what he was doing,

10   that there would be no further action taken against him, they

11   called me.  Once I got the motion, I said, well, let's hold up,

12   you know, for now until we hear from the Court.

13             But, yes, we would like to -- in a perfect world, we

14   would like to reach out and talk to the people and have that

15   conversation to see whether or not she trained them.  That

16   would be pretty powerful evidence at trial if she has

17   a $9 million contract allegedly because she's hiring and

18   training people and none of the people she hired and trained

19   can say anything about it.

20             And unfortunately now we have the witnesses, Vikram

21   Kumar and Shalabh Kumar, who are involved in contacting

22   potential witnesses in this case about that issue, which is the

23   subject of our motion, which I understand is not her.

24             But I think I answered the Court's questions.

25             THE COURT:  All right.  Do you anticipate calling some

1   of these individuals at a trial?

2          MR. McDONNELL:  Yes, we do, Your Honor.  There's only

3   six people, unless, of course, Ms. Le changes her testimony

4   now.  That would be testimony that we believe is inconsistent

5   with the plaintiff's claims, which is that she was working

6   there.

7          She was on the first payroll list from -- I believe it

8   was 2016, before the accident.  And the affidavit is before the

9   Court, which is that she doesn't even know who the plaintiff

10  is, and that's essentially why we sent them out.  So the

11  affidavit confirms that there was merit to our investigation.

12         THE COURT:  And --

13         MR. McDONNELL:  Everyone denies -- the investigators

14  deny going through mail or anything else like that, and there's

15  no evidence of anybody going through mail.

16         THE COURT:  All right.  How many individuals that

17  would fall into this classification would you anticipate

18  calling at trial?

19         MR. McDONNELL:  About a half a dozen.

20         THE COURT:  Okay.

21         MR. McDONNELL:  And, again, Judge, I am concerned.  We

22  did file a motion to sequester, but for some of these current

23  employees -- Vikram and Shalabh Kumar are witnesses in the

24  case, and right now Naomi Le is -- from our perspective, she's

25  proffered an affidavit saying this woman never trained me, I

 1    don't know who she is.  That's a witness, and that's one of the

 2    concerns we have with this estranged mechanism that has arisen

 3    in this case where we have two witnesses that are not

 4    sequestered pursuant to 615.

 5           They have been attending depositions.  They've been

 6    doing all this other kind of stuff, and as we have kind of

 7    raised informally, we are where we are, which is that this

 8    testimony could directly challenge the testimony of Vikram and

 9    Shalabh Kumar, and they're here at the hearing, Judge.  So I

10    understand -- I mean, it's not something that's typical.

11           THE COURT:  All right.

12           MR. KANNENBERG:  Your Honor, may I briefly respond?

13           THE COURT:  You can, and I have a couple other

14    questions for you, Mr. Kannenberg:  Number one, are you

15    planning on calling the Kumars at trial as witnesses; and then,

16    secondly, again, other than, it sounds like, evidence that

17    Mr. Kumar would have that would be based upon hearsay,

18    information he obtained from others, do you have any evidence

19    that investigators were going through people's mail or engaging

20    in some of the behaviors that have been described?

21           MR. KANNENBERG:  Yes, Your Honor.  This is, again,

22    Casey Kannenberg on behalf of Plaintiff.

23           And just in quick response to Mr. McDonnell's

24    comments, Ms. Le, who proffered the affidavit, was initially

25    hired by EMS in 2016 and worked there for several months and

1   then moved back to Vietnam, and she did not return back home

2   here until 2021.

3          So, you know, Mr. McDonnell basing his argument on the

4   fact that she specifically was not trained does not prove a

5   point.  She was absent from the country at the relevant time

6   period.

7          MR. McDONNELL:  Your Honor, can I respond very quickly

8   because that's not what the --

9          THE COURT:  Okay.  Gentlemen --

10         MR. McDONNELL:  That's not what the --

11         THE COURT:  Gentlemen --

12         MR. McDONNELL:  That's not what the --

13         THE COURT:  Gentlemen -- gentlemen --

14         MR. McDONNELL:  -- ADP payroll records said.

15         THE COURT:  Gentlemen, what was the first thing I said

16  when we started?  Do not speak over each other.

17         MR. McDONNELL:  I apologize, Your Honor.

18         THE COURT:  Mr. McDonnell, I will let you respond, but

19  let Mr. Kannenberg go ahead and finish his comments, and then

20  I'll give you time to respond.

21         Mr. Kannenberg, go ahead and finish your comments.

22         MR. KANNENBERG:  Thank you, Your Honor.

23         I just want to point out our witness and exhibit list

24  both were served to Walmart on July 7.  Pursuant to the local

25  rules, they were required to be disclosed 21 days prior to the

1    final pretrial conference, which is going to be taking place on

2    July 28.  So Walmart knows who our witnesses are because we

3    disclosed our witness list almost a week ago.

4              And, yes, both Mr. Vikram and Shalabh Kumar are on the

5    witness list, and we expect that they will be testifying as

6    part of the damages portion of the case.

7              THE COURT:  Just on the damages portion?

8              MR. KANNENBERG:  That's presently how we anticipate

9    using their testimony.

10             THE COURT:  Okay.  Go ahead.  Did you have anything

11   else you wanted to say?

12             MR. KANNENBERG:  As for -- as for -- I'm sorry.

13             THE COURT:  Go ahead.

14             MR. KANNENBERG:  I just wanted to -- as for witnesses

15   that Walmart is going to call, I can't tell you that because

16   they have not provided their witness list.  I have no idea who

17   these half a dozen individuals are that Walmart says they're

18   going to call in their case because they haven't disclosed them

19   today.

20             THE COURT:  Okay.  Mr. McDonnell, you can respond.

21             MR. McDONNELL:  Yes, Your Honor.

22             I have the ADP employment records, so we know exactly

23   when Ms. Le was working for the company, and we have her -- at

24   least her name appears to be continuous through this particular

25   payroll.  I haven't gone through them item by item, but I do

1   know that she was there at the end, and I do know she was there

2   at the beginning, and that's why she was identified.  We didn't

3   just pull people randomly off the list, Judge.

4        We used people that were in the ADP records so that --

5   you know, that may be also relevant.  If she was in Vietnam and

6   someone else was working for her and they were continuing to

7   pay somebody that they now claim was in Vietnam, that would

8   also be relevant to this particular matter.

9        I'm trying to look through the ADP records.  They

10   are -- they are significant.  But that is the issue, Judge.

11   The issue is why she doesn't know who she was and why the

12   people we reached out to don't know who she was and identify

13   her in a different capacity.  Like I said, they identified

14   her -- they identified the plaintiff in a different capacity

15   than supervisor.

16        MR. HOLLANDER:  Your Honor, may I make a comment?

17   This is Gary Hollander.

18        THE COURT:  Just a minute, Mr. Hollander.

19        Mr. McDonnell, what's the status of your witness list?

20        MR. McDONNELL:  Yes, Your Honor.  We were just

21   identifying these people, and my concern, again, is

22   sequestration because we have now interference with our witness

23   list, and I would like to be in a situation where I can

24   disclose these particular witnesses in particular and not be

25   concerned that they're going to be interfered with or they're

1   going to be intimidated.

2          Because that's our contention of really what's going

3   on.  This has nothing to do with an investigator leaving a

4   business card and asking six or seven questions.  This has to

5   do with the Kumars have testified that these people were

6   trained by the plaintiff, and that's critical evidence, and

7   they are listed as trial witnesses, and they are on this phone

8   call, and they are at every deposition, and Mr. Kumar signed

9   the interrogatories.  So that's our issue, Judge, and that's

10  why we filed a cross-motion.

11         THE COURT:  Okay.  Mr. Hollander.

12         MR. HOLLANDER:  Yes.  Thank you, Your Honor.

13  Gary Hollander.

14         So none of this evidence is relevant to this lawsuit,

15  this -- the origin of this was Mr. McDonnell making the claim

16  that this business was set up to commit a tax fraud, to evade

17  liability for violations of immigration law, which even that's

18  not relevant.

19         But, you know, there was a concern about is this

20  actually an entity.  Mr. McDonnell falsely told you that this

21  is part of something called the Kumar family trust, it was just

22  a shell of a company.  That led to this discovery, and the

23  discovery refutes every single thing Mr. McDonnell said.

24         This is a real company.  It had real employees.  The

25  entity was incorporated.  It transacted business.  We have

1    produced the business records.  We have produced the underlying

2    contract with Autotech.  ADP produced, I understand, over 3,000

3    pages of documents.  There were all these employees.  They were

4    paid by EMS.  They got actual paychecks.  EMS supplied the

5    money for the paychecks.  EMS earned money for the services it

6    provided to Autotech, ADP.  It's called various things in this

7    case.

8         This is a personal injury case.  The business

9    practices of the plaintiff or her entity aren't at issue in the

10   case.  The only legitimacy of any investigation into this was:

11   Is the plaintiff actually being paid this money?  Is she

12   actually the owner of a company?  Does the company actually pay

13   her the money reflected in her income tax returns?

14        There's no longer a question.  It does.  So the only

15   relevance of any evidence regarding EMS is that it was actually

16   paying the plaintiff the amount of money that the plaintiff

17   claims as part of her damage -- the damages she suffered in

18   this case.

19        This is -- this is beyond a fishing expedition.  These

20   are now employees -- at least some of these people -- of

21   Autotech.  They want to sequester them.  This is -- any

22   marginal relevance it's had, it has been satisfied that this is

23   a legitimate business.

24        The thought that in this personal injury case

25   Mr. McDonnell is going to call six witnesses to talk about

1    whether they were trained by Ms. Nsheiwat, frankly, I think, is

2    absurd.  It doesn't matter if she trained these witnesses.  She

3    described what she did.  They're employees of EMS.  They're

4    paid by EMS.  They're real employees of a real business that

5    pays real money in exactly the amounts we showed to

6    Ms. Nsheiwat.

7            This going down the road of the business practices of

8    EMS and of non-parties and of the Kumars is such a diversion,

9    so prejudicial, so irrelevant.

10            So for today's purposes, Mr. McDonnell wanting to send

11    the investigators out and talk to more of these employees who

12    he admits were paid -- he got their names from the ADP records.

13    There is no question they were employees of EMS and paid by

14    EMS.

15            I ask Your Honor to just shut this down.  That's

16    really all that's relevant for this motion today because this

17    is a dead end, it's harassment, and if any of this ever came in

18    as evidence at the trial, it would be prejudicial to the

19    plaintiff.

20            MR. McDONNELL:  Your Honor, if I could share my screen

21    and show you the ADP records where Ms. Naomi Le -- I've only

22    gotten halfway through them, Judge, but I'm showing you the

23    screen.

24            And if you look, this is Naomi Le, and these are the

25    agency records from 6-15-2017.  It's payroll.  So at this point

1   Ms. Le has been working at AVG Bettendorf.  These are

2   supposedly the plaintiff's employees that take it to a

3   10 percent kick-on on top of what they work.

4        So at the time, if she's in Vietnam, Naomi Le, if you

5   look at the third line down, is supposedly working at

6   Bettendorf AVG.  And she just -- I took the language directly

7   from Plaintiff's expert report, that the plaintiff was given

8   this money because she was supposedly hiring and training these

9   employees and supervising these employees.

10        And now we have an employee who has been working for

11  them for a year, and I'm sure if we go down through the

12  documents -- because I know she's at the end -- that Ms. Naomi

13  Le worked with Plaintiff, allegedly, from the time this company

14  was formed until 2018 and has no idea who she was.  And that is

15  directly contradictory of their expert report.  It's directly

16  contradictory to what Vikram Kumar said she did for the

17  company.

18        So, Judge, I'm not just casting aspersions.  I have

19  the receipts, Judge, and I have the ADP records, and that's why

20  it's relevant, which is, hey, Ms. Le, do you know who Raya

21  Nsheiwat is?  Did she train you?  Did she supervise you?

22        And if you look on the screen, you've got employees --

23  and if the Court wants me to look down another thousand pages,

24  my guess is we'll find her, that she was there in 2018 at the

25  time that she was working.

1           And to dismiss this and say that all we have to show

2    is that the books look good, that's not it.  She supposedly is

3    losing income because she can no longer train and supervise and

4    do these things for the company.

5           I don't have any question that, for whatever reason,

6    they decided to transfer some of the payroll and give

7    Ms. Nsheiwat 10 percent of these employees' salaries on top of

8    what they paid them, but that's relevant, Judge, because that's

9    exactly what the expert report says, and that's exactly why we

10   sent investigators out.

11          And that's why when Vikram Kumar takes the stand, even

12   though he's on the phone, and says, oh, no, we gave her this

13   benefit because she was so valuable and trained all these

14   people, of course I'm going to put the person on to say, I

15   never met this lady.

16          And, by the way, I didn't gather that evidence.  The

17   plaintiffs proffered an affidavit to this Court that said, I

18   don't know her.  And they were so fixated on showing our

19   investigator was doing something untoward that they forgot

20   there's payroll records for EMS that she got a 10 percent

21   kicker on this particular area that shows conclusively that she

22   doesn't know who she is.  How is that not relevant in the case?

23   And that's not the standard I have to meet as to whether or not

24   I can go.

25          So, yes, Judge, that's the evidence we would like to

1    do, and if it's six people, that's compelling.  But what we

2    have found out so far is that every person who has been asked

3    about her has not said they were hired or trained.  They said

4    they were hired or trained by other people.  So this isn't me

5    being a big meanie.

6            And, again, Judge, Vikram Kumar and Shalabh Kumar are

7    on this phone.  They are witnesses to the case, so I don't

8    understand why, pursuant to Rule 615, I have to introduce the

9    likely testimony of witnesses in front of other witnesses,

10   particularly where, if Mr. Kumar got on the stand and told that

11   story, she was in Vietnam, I would be able to confront him and

12   cross-examine him with this evidence, and I'm forced to do it

13   at this hearing, which is -- what I suspect, again, is that the

14   employees are upset because they can't even mention this

15   particular information, and that's what started this affidavit.

16           But if the Court wants, I can continue going on

17   because Mr. Kannenberg made a specific representation.  He said

18   this woman was in Vietnam.  So if Mr. Kannenberg can tell us

19   when she was in Vietnam, I'm happy to go to the ADP records to

20   see when she falls off this list, but I don't believe she does

21   fall off this list.

22           But if he has a specific day and time when she was in

23   Vietnam before the plaintiff worked, maybe we can start with

24   facts and evidence as opposed to coming in with somebody and

25   saying, oh, the investigator was rifling through mail, without

1  any evidence.

2       THE COURT:  All right.  Counsel, a couple things:

3  number one, the only issue I'm deciding today is the issue

4  relating to the motion for protective order, and then I have a

5  cross-motion for protective order relating to these

6  investigators and the individuals they have been talking to who

7  are either current or former EMS employees.

8       The issue of what evidence is going to come in at

9  trial is going to be up to Judge Pratt.  I know some of these

10  issues have been raised in the variety of motions that have

11  already been filed, and they are pending in front of

12  Judge Pratt waiting for your final briefing.  So I'm not here

13  to address that, so I don't need to hear argument about what's

14  going to happen at trial because that's not an issue for me to

15  decide.

16       Secondly, in the event that some of these individuals

17  are allowed to testify, a lot of what you guys are talking

18  about is going to be cross-examination, potentially

19  impeachment, and/or other related examinations of the

20  witnesses.  Again, not an issue before me today.  The only

21  issue in front of me today is related to the motions for

22  protective order.

23       I will get a ruling out on that as soon as I can.  I

24  won't promise you that it will be today or tomorrow, but we

25  will be working on it and already have started, but I wanted to

1  have a better understanding as to what evidence there was

2  because there's some pretty broad allegations in the motion

3  about the techniques that were used by the investigation team.

4         Mr. McDonnell, was the -- the investigators, are they

5  all from the same firm, the same firm that Mr. Stonehouse is

6  from?

7         MR. McDONNELL:  Yes, Your Honor, which is a licensed

8  and bonded firm, and they all were given the same script and

9  the same parameters.  Because there was no specific allegations

10  against any other investigator, I did affidavits.  But I have

11  spoken to the folks that did it, and they assured me nobody

12  went through any mail and that wasn't done.

13         And, Your Honor, I did confirm through the ADP records

14  that I have a payroll record from 6-15-2018, so Ms. Naomi Le

15  was in the country allegedly working at AVG Bettendorf at the

16  time that this accident happened, as I suspected.

17         So, yes, that's why we sent investigators out, and

18  from all the information we have, they acted appropriately,

19  including the plaintiff's affidavit, which is that he made

20  contact with her at 9:30, he spoke to her, he asked questions

21  narrowly to the facts of the case:  Did the plaintiff train

22  her?  And, other than that, this is just simply hearsay from

23  two witnesses who -- the testimony of these people may be

24  contrary to theirs.

25         THE COURT:  All right.  With respect to the -- to

1  Mr. Kumar, to the extent they're going to be witnesses in the

2  case, they will be subject to sequestration just as every

3  witness will be except for the plaintiff and whoever the

4  corporate representative is that is going to be with

5  Mr. McDonnell at trial, if that individual is testifying.

6      I don't know who that individual is or if they're

7  going to be testifying.  But they will be the two people who

8  will not be subject to sequestration, and that should start

9  now.  They shouldn't be having conversations with other

10  witnesses.  No one.  I'm not suggesting just the Kumars.  None

11  of your witnesses should be having conversations with other

12  witnesses.

13      To the extent there's a need for anybody to talk to

14  the individuals that we're talking about, such as Ms. Le or

15  anybody like that, it should be the lawyers.  And to the extent

16  that I allow any investigators -- and I haven't made that

17  decision yet, I will put that into the order -- but going

18  forward, I want the communications to be with the lawyers.

19      To the extent that an employee comes up to Mr. Kumar

20  and starts to talk to him about the litigation, he should send

21  them to the lawyers or have one of his lawyers contact that

22  individual.

23      I don't want there to be any question when we get to

24  the trial about what's happened here.  I think we have already

25  got a lot of questions about what's happened in this case, and

1    I know that's the subject of a lot of motions that are pending

2    in front of Judge Pratt, including motions in limine that have

3    been filed.

4         So with respect to the motions for protective order, I

5    will get that taken care of here in the near future, and I take

6    that motion under advisement.

7         Before I turn to some questions I have about some of

8    the other pending motions, any other record anybody wants to

9    make?

10         Mr. Kannenberg?

11         MR. KANNENBERG:  Your Honor, I have --

12         MR. HOLLANDER:  Your Honor, I do have a question if I

13    could speak for Plaintiff here for a minute.

14         THE COURT:  Just a minute, Mr. Hollander.

15         Mr. Kannenberg, finish what you were saying.

16         MR. KANNENBERG:  I was in the process of saying I have

17    nothing further for Plaintiff before Mr. Hollander made it

18    clear that we do have something further.

19         THE COURT:  Okay.  Before Mr. Hollander interrupted

20    you.

21         So now, Mr. Hollander, you can speak, and nobody

22    interrupt Mr. Hollander.

23         MR. HOLLANDER:  Thank you, Your Honor.

24         So I just had a question about the sequestration

25    order.  So these employees obviously -- several of them, at

1  least, work for the Kumars' business now.  As I understand it,

2  you said if these employees come up to the Kumars and talk

3  about the litigation, they are not to talk to them, they're to

4  refer them to the lawyers.  That's crystal clear.

5       But what I would like clarification on is can the

6  Kumars do their normal business and speak to the employees

7  about the business when there's a need to do so.

8       THE COURT:  Yes.  They can talk to them about the work

9  they're currently performing.  They cannot talk to them about

10 anything related to the lawsuit.  If there's an issue about or

11 people have a question about the lawsuit, they need to direct

12 them to you or Mr. Kannenberg, yes.

13      MR. HOLLANDER:  Thank you.  And I didn't mean to

14 interrupt Mr. Kannenberg or anybody else, but I didn't want my

15 clients, the Kumars, to do something that then ended up running

16 amiss of something you expected them to do.  So thank you for

17 the clarification.

18      THE COURT:  And I'll put that clarification into the

19 order as well so everybody knows what I'm saying they can and

20 cannot do.

21      Mr. McDonnell, anything else before we move on?

22      MR. McDONNELL:  Yes, Your Honor.  Just as far as the

23 sequestration order, Mr. Kumar has attended doctors'

24 depositions, medical appointments.  He signed the

25 interrogatories.  He's been to all of Walmart's depositions.

 1  He was present during the plaintiff's deposition and involved

 2  in conferences with the plaintiff, so that's what's taken place

 3  so far.

 4      And I know there's more depositions and expert

 5  depositions, but my assumption is the sequestration order

 6  applies from this point forward in the case and that we won't

 7  be seeing Mr. Kumar appearing or interfering with depositions

 8  or medical appointments or anything else like that.

 9      THE COURT:  That's correct, going forward, because I

10  can't prevent anything that's already happened.  No one has

11  asked for an order, and my understanding was in the past

12  there's been some agreements, not necessarily with this group

13  of attorneys, various attorneys, that Mr. Kumar could attend.

14  And that's not Vikram Kumar.  That's his father is my

15  understanding of the person who was at those previous

16  depositions.

17      Can't change that.  But going forward, they should not

18  be present at any depositions of individuals who are going to

19  be witnesses since they are also witnesses in the case.

20      Mr. Hollander, did you have something else to say?

21      MR. HOLLANDER:  Yes.  Thank you, Your Honor.

22      Mr. Shalabh Kumar is the power of attorney for

23  Plaintiff, so he's been in -- and there's obvious language

24  issues with Plaintiff, so he's been actively involved in this

25  case.  He hasn't interfered with any of the depositions.  He's

1    attended every deposition in this case.  I believe that, as the

2    power of attorney, he has the right to attend the depositions

3    in this case.

4            THE COURT:  I would like you to give me some legal

5    authority on that, Mr. Hollander, so if you would submit a

6    brief to me on that topic, I would appreciate it.  Okay?

7            MR. HOLLANDER:  Yes.  Thank you.

8            THE COURT:  Mr. Kumar, I am not going to have you

9    talk.

10            MR. KUMAR:  Can I ask a question?

11            THE COURT:  No.  You can talk to your lawyers after.

12    I'm not going to have you talk because if I do, I'm going to

13    have to put you under oath, and Mr. McDonnell is going to have

14    an opportunity to cross-examine you.

15            MR. KUMAR:  Okay.

16            THE COURT:  You can ask your lawyers afterwards, and

17    they can let me know if there's something further or an issue

18    we need to do a clarification on.

19            MR. KUMAR:  All right.  Thank you, Your Honor.

20            THE COURT:  All right.  The next thing I wanted to ask

21    you about, since I have you all here, is the motion to extend

22    the discovery.  What I want to know specifically is what

23    exactly it is you want me to extend the discovery for.

24            As I look at the plaintiff's motion, I see a listing

25    in paragraph 6 of a number of depositions that have been

1    scheduled.  Some of them, it sounds like, have already been

2    completed, but then there's a number, starting with --

3    actually, today it looks like you have one.  You have a

4    defendant's expert witness; on the 18th, you've got a

5    plaintiff's expert; it looks like you have some potential dates

6    for another Plaintiff's expert July 20, 21, and 27.

7            Has that been finalized is the question.

8            And then I see also on July 26 you have Plaintiff's

9    expert.  July 27 is a potential date of another of Plaintiff's

10   experts.  And then it looks like there's a few dates given in

11   August for some additional depositions, one is Dr. Sundar, and

12   then the other is Shawn Welch, which is the subject of another

13   pending motion that the Court is working on.

14           So the first question, I guess, is:  Have all of these

15   depositions, Plaintiff's counsel, been scheduled?  Do we have

16   dates for everything?  And if yes, what's the date of the last

17   deposition that you have scheduled in this group?

18           MR. KANNENBERG:  Casey Kannenberg, Your Honor, on

19   behalf of Plaintiff.

20           We have been working, I think rather well, with

21   Defendant on the issue of scheduling these depositions.  We

22   have locked down most of them.  We are still fine-tuning a

23   little bit with respect to some of these experts towards the

24   end of July and early August, trying to confirm some

25   availability.

1          Some of these witnesses are surgeons or health care

2     providers who have schedules that we need to accommodate.  For

3     example, Dr. Stadlan was -- we tentatively agreed on today, but

4     counsel for Walmart said we needed to reschedule that because

5     of his schedule, and we're willing to accommodate that and to

6     reschedule that.

7          But we believe we are working well together to get

8     these depositions scheduled.  We don't have every single one

9     scheduled, but I anticipate they will be finalized in the

10    coming days, so that's not an issue.

11         What I don't think before the Court is an extension of

12    the discovery cutoff for any other reason.  There's no motion

13    to extend the discovery with respect to Walmart's continued

14    investigation into EMS employees.  That has not been -- that's

15    not a motion before the Court.

16         I expect Walmart is going to argue that our request

17    for a site visit, which is the subject of another motion --

18    these are kind of interrelated issues -- but we do not believe

19    that is discovery that we're seeking to do with respect to that

20    motion.  That is purely for purposes of preparing a

21    demonstrative aid at trial.

22         So the only discovery that Plaintiff seeks in its

23    motion to extend is the limited purpose of scheduling these

24    remaining depositions.

25         And I believe the last date that has been proposed

1    that we're working to finalize is Walmart proposed an August 4

2    date for one of the witnesses.  I don't believe there's -- it's

3    anticipated that there will be any depositions after August 4.

4    I think we will have all of them wrapped up by that point.

5            THE COURT:  All right.  A couple questions.  Question

6    one is:  Assuming that you are granted permission to extend the

7    deadline to August 4, do you have a plan in place, if you have

8    depositions that occur the last week of July, the first week of

9    August, to get your deposition transcripts in advance of the

10   trial?

11           MR. KANNENBERG:  Yes, Your Honor.  We will be

12   requesting expedited transcripts from the court reporter

13   services.

14           THE COURT:  And do you anticipate that any of these

15   individuals who might be deposed, at least on behalf of the

16   plaintiff, in that latter part of July, early part of August,

17   would they be appearing in person or by deposition?

18           MR. KANNENBERG:  At trial?

19           THE COURT:  At trial.

20           MR. KANNENBERG:  At trial or --

21           THE COURT:  Yes, at trial.

22           MR. KANNENBERG:  Okay.  Yes.  At this point we expect

23   all of Plaintiff's witnesses will be appearing live at trial.

24           THE COURT:  And that includes all your experts?

25           MR. KANNENBERG:  That's correct, Your Honor.

1              THE COURT:  Okay.  Same question to you,

2    Mr. McDonnell:  One, to the extent that the Court grants this,

3    do you have a plan in place in order to get transcripts in

4    advance of the trial; and, two, do you anticipate that any of

5    Defendant's witnesses are going to be presented by either video

6    or reading a deposition in at trial?

7              MR. McDONNELL:  Yes, Your Honor.  Two of the treating

8    doctors we have already put in the can and videoed, and

9    Mr. Stadlan most likely is going to be presented by video, at

10   least tentatively.  And, yes, Judge, most of the court

11   reporters have this daily read or expedited transcript

12   function.

13             THE COURT:  Okay.  And tell me again, you said

14   Dr. Stadlan, Noam Stadlan, you think he'll likely be by video?

15             MR. McDONNELL:  Yes.  I don't have that confirmed,

16   Judge, but 99 percent of these doctors that do this work want

17   it done by video.

18             THE COURT:  Okay.  And the reason I'm asking is,

19   obviously, to the extent you're going to use any of these

20   individuals by video or by reading a deposition, the Court is

21   going to have to have a copy of that in advance, and to the

22   extent -- maybe there aren't any, but to the extent there's

23   objections that Judge Pratt needs to rule on, I'm going to need

24   to know what those are, so we are going to have to figure out a

25   time frame for that.

1          To the extent you've already got them done, that can

2    simply be included with your final pretrial order filing.

3          But my concern was, to the extent that some of these

4    people might be closer in time to the final pretrial

5    conference, that we wouldn't have that prepared.  So I just

6    want to be thinking about that for Judge Pratt so I can make

7    sure I get that in place in advance for him so that he has it

8    and can get any rulings out that need to be ruled on before you

9    show or read the depositions, whichever it might be.

10         Second question for you, Mr. McDonnell:  One, do you

11   have any objection to the Court granting an extension of the

12   discovery deadline for the completion of the depositions that

13   are outlined in paragraph 6 of the plaintiff's motion?

14         MR. McDONNELL:  None, Your Honor.

15         THE COURT:  Okay.  And then, again, is there

16   anything -- is there anything else you think is going to happen

17   or you are asking to have happen during this extended discovery

18   period?

19         MR. McDONNELL:  Your Honor, other than what we put in

20   the motion, which is that we are going to identify the

21   employees that have already identified themselves.  But other

22   than that, Your Honor, I think we're -- and I have also taken

23   the economic information that we just got recently and given it

24   to our economic expert, so there might be the need for him to

25   amend his economic report.

1      But other than that, Judge, that would be the only

2  discovery issues that we would have remaining.

3      THE COURT:  All right.  And if he is going to amend

4  that, when are you anticipating that would happen?

5      MR. McDONNELL:  I've got a call into him right now,

6  Judge.  Hopefully within the next 10 days.

7      THE COURT:  And to the extent that that happens, are

8  you prepared to offer him up to the plaintiff's counsel to do a

9  supplemental deposition if they want one?

10      MR. McDONNELL:  If necessary, Judge, yes.

11      THE COURT:  All right.  Okay.  I'm going to move on

12  from that motion, and I am going to talk next about 175, which

13  is the plaintiff's motion to conduct a site survey.

14      Judge Pratt and I have a number of questions about

15  this, to be honest.  I understand it's for a demonstrative aid.

16  However, our court typically requires, obviously, that it be

17  shown to the other side and to the Court, and to the extent

18  that there are objections to it, the Court would have to rule

19  on those.

20      I do have a number of questions about that in terms of

21  the fact that, one, this is so far after the incident that is

22  the subject matter of the litigation that it's a completely

23  different viewpoint from what anybody would see.

24      And it's my understanding, unless I'm incorrect in

25  this regard, that there is a videotape of the actual incident.

1        So I don't know who on Plaintiff's counsel wants to

2    respond or talk about that particular issue, but I'll let

3    whoever is handling that aspect.

4        MR. KANNENBERG:  Your Honor, Casey Kannenberg on

5    behalf of Plaintiff.

6        I guess I would first point out that the only relief

7    that is before the Court today is Plaintiff seeking to conduct

8    a site visit to prepare a trial demonstrative aid.  There is no

9    pending motion by Walmart seeking to bar Plaintiff's use of any

10   demonstrative aid, so, you know, whether Plaintiff will

11   ultimately be permitted to use the animation is not an issue

12   that is before for the Court's determination today.

13       And with respect to the Walmart parking lot, there

14   really isn't any evidence or affidavit from any Walmart

15   personnel that the Walmart parking lot is any different in any

16   way today than it was at the time of the incident, nothing

17   showing the dimensions of the parking lot are different or the

18   corrals have been rearranged or are in some way -- are in any

19   way different.  There's no evidence of that in the record.

20       THE COURT:  Mr. Kannenberg, would you agree with me,

21   though, that there's no evidence of the opposite of that

22   either?  I mean, I don't have any evidence here today that

23   tells me what the parking lot today looks like as compared to

24   when the incident occurred.  Either it's the same or it's not

25   the same.

1            Would you agree with that?

2            MR. KANNENBERG:  Well, yes, Your Honor.  But to that

3    point, as you pointed out, there are also videos and

4    photographs in the record that the animation people can use to

5    make sure that the -- any animation would be accurate, to the

6    extent possible, when they put together the final product.

7            THE COURT:  And what is it that you anticipate this

8    final product will be?  A video of what or an animation of

9    what?

10           MR. KANNENBERG:  Right.  It will depict and will be

11   very helpful to the jury in terms of showing them what we

12   think -- what the evidence shows about how the incident

13   occurred.  With, you know, the accurate dimensions of the

14   parking lot, it will allow them to visually see what we are

15   arguing the evidence shows about how the incident occurred from

16   the plaintiff going to the corral with the cart and slipping on

17   a hanger.

18           And, again, I know that the -- whether or not this

19   demonstrative aid will be admitted at trial is not really

20   before the Court today, but we do think this is something that

21   would be very, very helpful to give the jury a visual reference

22   of how the incident occurred.  And the site visit is important

23   so that we can make sure that it is accurately portrayed in the

24   animation.

25           THE COURT:  All right.  Mr. McDonnell.

1           MR. McDONNELL:  Yes, Your Honor.

2           We did turn over in discovery the plot plan, the

3   diagram of the -- like, the basic plan of the parking lot.  The

4   cart corrals have completely changed since the time of the

5   accident, at least that's my understanding.  The asphalt has

6   obviously been covered and recovered.

7           But, ultimately, this case is about the plaintiff

8   falling on a hanger, and the structure of the parking lot or

9   the corrals or anything else like that, if that was important,

10  it could have been dealt with in discovery.  And I think

11  Mr. Kannenberg is trying to be coy about it, but at the end of

12  the day, this inspection is an inspection that should have been

13  done by an expert during discovery and pictures and documents

14  produced so that way I could have questioned the plaintiff at

15  her deposition about any sort of diagram or about any sort of

16  material.  There's no evidence that she's going to lay the

17  foundation for any of these materials, and I don't think a

18  month before trial we should be creating new evidence that

19  we're going to have to deal with.

20          And the issue is:  This isn't a site inspection,

21  Judge, for a demonstrative.  They have a plot plan they can

22  draw in, and they can do what they want to do.  There are

23  photographs of the cart corral.  And I think at the end of the

24  day what they're asking for is an opportunity for an expert,

25  who they're calling a visual specialist but most likely will be

1   brought in through their existing experts, to do an accident

2   reconstruction.

3           I've cited tons of case law that says that you need an

4   expert in accident reconstruction, and then I would be able to

5   take the deposition of the accident reconstructionist.  I would

6   get to know the software.  So what they're proposing, this is

7   just a site inspection, is not accurate, Judge.  They have

8   photographs of the incident.  They have photographs of the cart

9   corral.  They have photographs of the hanger.  They have

10  videotape.  They also have a plot plan of the property.  And so

11  far -- she didn't trip on the corral or anything else like

12  that.

13          So in this case, Judge, we've had -- we've had at

14  least six or seven status conferences and discovery conferences

15  related to this particular area where, if that was the issue, I

16  could have attended, I could have had an expert there for it,

17  but so far no expert has proffered any sort of specifics with

18  respect to Walmart's property, that that's in any way related

19  to the happening of the accident.

20          From what I understand, she fell on a hanger.  And

21  nobody said anything about the cart corral or the asphalt was

22  improper or we didn't lay the parking lot out properly.

23          So it's discovery, and what it's going to do is add

24  another layer of motion practice and add another layer of

25  discovery because they intend to go forward and do that.

1          Is the plaintiff going to go there and say, This is

2    where I fell, and this is how I fell, because I didn't get to

3    depose her with any sort of diagrams?

4          So we don't create new evidence after the discovery

5    deadline because we don't like the evidence that exists.  There

6    is photographs of the cart corral.  There's a photograph of the

7    hanger on the ground.  There's a video of the accident.

8          So I don't understand -- you know, and they're being

9    coy, Judge.  From my perspective, it's very clear that they

10   intend to do an accident reconstruction.  They haven't

11   identified an accident reconstructionist, and I don't think,

12   given we haven't finished the existing expert depositions, that

13   Walmart has to be scrambling around and I have to find out what

14   conditions were changed or what conditions were not changed.  I

15   might have to bring in new evidence to talk about when the cart

16   corrals were done.  I mean, it's absurd, Judge.  We're at

17   trial.

18         THE COURT:  Mr. Kannenberg, help me understand exactly

19   what this is going to be.  I mean, are you envisioning that

20   what this is, is an animation of an individual falling in the

21   cart corral similar to what happened to your client, or is it

22   just going to be an animation of the actual parking lot with no

23   people in it?  I'm struggling to understand what it is.

24         MR. KANNENBERG:  Yes, Your Honor.  My understanding is

25   it's going to be an animation that depicts the parking lot, the

1    corrals, and you kind of set the scene and give the jury kind

2    of a visual representation of what -- you know, just what the

3    scene looks like.  They're not -- and I do believe it will have

4    a depiction of the sequence of events that we are alleging

5    happened.

6         And, you know, one of the reasons why this is going to

7    be so helpful to the jury is because, while we do have a video

8    from the surveillance footage, it's really kind of hard to see

9    what's going on.  It's kind of grainy.  It's pretty far away.

10   And so using that video -- just if we're forced to use that

11   video by itself, it's really not very helpful.  It's not going

12   to help the jury understand, you know, how the sequence of

13   events happened and, you know, what the scene looks like.

14        The company that we're retaining for this animation

15   has done thousands of these videos just like this that have

16   been admitted in courts, and we think it's going to be very

17   helpful to give the jury the opportunity to have that visual

18   representation of what we are alleging took place on the day of

19   the incident.

20        THE COURT:  So I am assuming from Mr. McDonnell's

21   comments, that he's going to object to it, based upon what he's

22   said so far.  So I understand you're wanting to use it as a

23   demonstrative aid, but, I mean, you're still going to have to

24   convince the Court, through some testimony or some mechanism,

25   that this is actually accurate.

1          And it strikes me that what we're going to have is a

2    mini trial about whether or not this particular demonstrative

3    aid should even be allowed to be used.  And it's going to be

4    something potentially, I'm guessing, you're going to try to

5    use -- I don't know -- in opening statements or not until

6    testimony comes in.

7          What's your thought in that regard, Mr. Kannenberg?

8          MR. KANNENBERG:  Yeah.  We potentially will use it in

9    opening statement as a demonstrative to show what we believe

10   the evidence will bear out.  The local rule regarding

11   demonstrative aids specifically defines a demonstrative aid as

12   an animation, so the rules of this Court anticipate that

13   parties will use animations like this for demonstrative

14   purposes at trial.

15         We did disclose it, pursuant to the local rules, on

16   our exhibit list that we circulated last Friday, so it has been

17   disclosed properly pursuant to the rules.

18         We also agree that any animation would need to be

19   exchanged to the opposing counsel, pursuant to the local rules,

20   so there would be an opportunity to have that dialogue about

21   whether it's admissible or not.

22         Again, that's not before the Court, but we do

23   anticipate complying with the rules in regard to sharing and

24   exchanging of exhibits and demonstrative aids and allowing them

25   the opportunity to view the resulting animation and have that

1    argument with Judge Pratt at trial when it's appropriate.

2            THE COURT:  All right.  Mr. McDonnell, anything else

3    you want to add?

4            MR. McDONNELL:  Sure, Your Honor.  My response is this

5    happens frequently in tractor-trailer cases and in accident

6    cases, and what Mr. Kannenberg keeps admitting to is this is

7    the plaintiff's opinion about how the accident happened.  In

8    other words, that it is an accident reconstruction.  And I have

9    cited in my brief legions of cases talking about what parties

10   are qualified to do in an accident reconstruction.

11           In this case they produced no expert report that

12   purports to be an accident reconstruction.  There are no

13   witnesses so far that I have had to do the diagrams or the

14   underlying material that I have been able to depose to lay any

15   sort of foundation.  And what the plaintiffs are proposing at

16   the last minute is an investigation for the purposes of

17   offering an accident reconstruction.

18           They can call it an animation, but the cases that I

19   cited talk about the differences between an animation and a

20   simulation.  An animation is -- let's say they want to

21   demonstrate some scientific principle.  Like, for example,

22   here's an animation of how a certain medical procedure is being

23   done.  It's generic, and the jury isn't told this is how the

24   accident happened; they're saying, okay, here's an animation of

25   how an engine works or how this works, to be helpful for the

1   expert to explain.

2          A simulation or a reconstruction is a completely

3   different category, and that is expert testimony.  They want to

4   offer an opinion:  In our opinion, this is the way the accident

5   happened.  And so far there hasn't been a single witness that

6   has testified to that.

7          So what they're asking for a month before trial -- I

8   shouldn't have to spend -- it's going to take me 200 hours to

9   respond to various motions.  I don't know what software they're

10  going to use.  I don't how they're going to render it.  In this

11  particular situation, Judge, when I have seen simulations or

12  reproductions, the expert produces them at the time they

13  produce the report.  I have cited multiple cases, and I know

14  that sometimes the plaintiffs don't cite cases in any of their

15  applications, but I do respond with case law.

16         And there's case law on this point to describe the

17  difference between an animation -- you know, if we wanted to

18  show something generic, like I have seen in closed head injury

19  cases, like, this is what the brain does, and this is -- the

20  plaintiff wants to play up that this is just generic.  That's

21  not what this is.  This is not an animation.  It is a

22  simulation; it is a reconstruction; it is an opinion.  And then

23  how do I deal with if the cart corral looks differently or the

24  parking lot looks differently?

25         So, Judge, that's the problem is you're saying the

1   plaintiff can impose a thousand hours of trial preparation work

2   that I'm going to do.  Will I get to depose their accident

3   specialist, which hasn't been identified so far, or their

4   visual specialist and ask what kind of software he uses or what

5   factor he used or how he got the -- I mean, it's abusive,

6   Judge, to walk in a month before trial and say, I'm going to

7   dump this on my adversary, and I'm going to dump this on the

8   Court.

9           Because this case has a 2020 docket number.  So

10  they've had three years to go to Walmart and at least submit

11  the underlying factual basis of all of this.  Here's the

12  dimensions of the cart.  Here's where we contend how far away

13  she was from the cart.  Here's where we contend where the

14  hanger was.  None of that has been produced in discovery,

15  Judge.  The only thing we have in discovery is, I walk in the

16  cart, and I trip on a hanger.

17          So now they're going to get an animation?  It's

18  absolutely abusive and vexatious to come into a court a month

19  before and say, Let me tell you what we're going to do.  And we

20  had five conferences before this, Judge, and they never

21  mentioned, oh, by the way, we're going to do a site inspection.

22          So this is a Hail Mary at the end of the day because I

23  took the plaintiff's deposition, and they don't -- for whatever

24  reason, they don't like the accident scene itself in the

25  photographs, and they want to make a new version of it.  That's

1    not a basis for discovery.

2           An entry upon land is covered by a discovery rule.

3    It's, I believe, Rule 34.  I cite it in my brief.  And they

4    were required to ask for that during discovery, and they

5    didn't.

6           So this is not a demonstrative.  They have a plot

7    plan.  If they want to have the plaintiff draw where she was

8    with respect to the cart corral, that's a demonstrative.  If

9    they want to take a scaled drawing from the code official's

10   office and say this is what was approved, I think that's fair.

11          But they haven't offered any opinion that there's any

12   problem with the Walmart parking lot, it wasn't up to code,

13   that the cart corral was wrong, none of that.

14          So I am supposed to wait for an inspection and then

15   I'm going to wait for software, it sounds like, in the midst of

16   all these other expert depositions that we're going to take

17   between now and August -- and I have a trial, by the way,

18   starting Monday -- and I am going to have something dumped in

19   my lap, and the Court is going to have something dropped in its

20   lap right before trial.

21          So if they've disclosed this animation, Judge, I

22   haven't seen it.

23          THE COURT:  All right.  I guess what I understood

24   Mr. Kannenberg to say -- and maybe I misunderstood -- was that

25   they had mentioned in their exhibit list that there would be

1    this animation, not that they have actually shown it to

2    Mr. McDonnell.

3            Is that correct, Mr. Kannenberg, because obviously it

4    doesn't exist at this point in time?

5            MR. KANNENBERG:  That's correct, Your Honor.  And,

6    actually, the procedural mechanism for any challenge to an

7    exhibit offered by a party set forth in the local rules is to

8    include that objection in the final pretrial -- the proposed

9    final pretrial order, which the parties are to submit to the

10   Court three days prior to the July 28 scheduling conference.

11           MR. McDONNELL:  And my response, this is opinion, this

12   is expert opinion at the last minute that they want to

13   disclose --

14           THE COURT:  Okay.

15           MR. McDONNELL:  -- which has not been disclosed.

16           THE COURT:  Gentlemen, I get it.  Okay?  I'm good.

17           Here's my dilemma:  Part of my job is to make sure

18   that Judge Pratt isn't overwhelmed at the trial with a bunch of

19   things that he wasn't anticipating, so part of what I'm looking

20   at as I look at these things isn't just whether or not there's

21   going to be an objection to it, but do we have time to even

22   deal with these things.

23           I mean, you guys have a huge amount of work to do

24   between now and the final pretrial conference in July and then

25   the trial on August 14.  I know you know that.  I can tell it

1  from everything I have here in front of me as well as all the

2  motions pending in front of him.  So part of what I have to do

3  is sort through and see what's proportional, what fits within

4  Rule 1 in terms of giving us a just, speedy, and efficient

5  resolution of cases.  So I will get that done.

6           A couple of additional questions for you.  I do have

7  now, as I said, the plaintiff's response to the defendant's

8  July 3, 2023, status report or request for the plaintiff's

9  deposition.  I don't really have any questions for you at this

10 time.  I have not yet had a chance to read the plaintiff's

11 filing that was just submitted late yesterday afternoon.  I

12 will get that done.

13          I will give you each a couple of minutes -- I do have

14 another hearing at 11.  That's the other thing I'm cautious of.

15 I'll give you each a couple of minutes if you want to say

16 anything related to that.  Specifically focus on what it is

17 you're asking for with regard to the plaintiff's deposition.

18 I'll give you that opportunity.

19          The second question I have is:  Have we resolved the

20 issue of whether there are any interpretation issues that are

21 going to be raised?  I know when we had the impromptu status

22 conference with you during the plaintiff's supplemental

23 deposition, there was some issues raised about the

24 interpretation.

25          Mr. McDonnell indicated that he might have his own

 1  interpreter look at the deposition and see if he had any

 2  concerns or questions about the interpretation, and I would

 3  like to have a sense of whether that's happened and, if so,

 4  whether we anticipate that being an issue that Judge Pratt is

 5  going to have to deal with or that we're going to have to deal

 6  with either prior to trial or on the eve of trial, because I

 7  think we're building up a lot of things that have to be dealt

 8  with on the eve of trial.

 9         So let me just stop there.  Mr. McDonnell, anything

10  you want to say about that particular motion that you filed?

11         MR. McDONNELL:  Yes, Your Honor.  We did send the

12  video and the transcript to the alternative translator.  She

13  hasn't specifically gotten back to me.  Although, the plaintiff

14  has filed a version of the transcript, for example, the second

15  version of it, and I note that it's -- in two hours, I asked

16  approximately ten questions:  When did you start work?  Who was

17  your supervisor?  What kind of work did you do?  What kind of

18  boards did you work?  What did you design?  That took, Judge,

19  over ten hours to ask ten basic questions.

20         The transcript itself is only roughly -- it was three

21  and a half hours of running time.  The deposition is only about

22  80 pages.  If you talk to most court reporters, they'll explain

23  to you that it takes about -- you know, it's about 60 pages per

24  hour, about a minute.

25         So most of the deposition, Judge, was -- we

1  accomplished very, very, very little.  I think in some sense

2  the transcript speaks for itself, but if you look and see what

3  the questions I was actually trying to ask, they are so basic.

4  Did she hire the employees?  Did she actually physically work?

5  Did she, you know, hire the employees?  And all of it, Judge,

6  was either nonresponsive, there were objections.

7           And that's my issue, Judge.  I spent two days, and we

8  got through very little substantive testimony, in part, because

9  of the problems.  And the issue was I wasn't able to ask any

10  questions about her prior medical history, I wasn't able to ask

11  any questions about her medical treatment, in part, because it

12  took an hour for me to ask her whether or not she actually

13  physically was at the factory supervising employees and what

14  she actually did when she was there.

15           There was an insistence on the part of the plaintiff,

16  when I would ask the question, What kind of board did you work

17  on, what did you do here, Well, I have the board ready, let me

18  show it you.  And in all respect to the plaintiffs, I don't

19  have to participate in a show-and-tell.  I can ask her specific

20  questions:  Did you put components in the board?  These were

21  basic, basic questions that anyone familiar with electronics

22  would be able to ask, and she essentially didn't answer them.

23  Instead, she said, oh, no, I have to have these things that I

24  prepared to show you.

25           So that's the problem, Judge.  If you look at the

1  transcript, it's the same as the first session.  There was very

2  little substantive questioning that was asked, and, in part, it

3  was because, you know, it took two hours to get ten questions

4  in.

5       And the third day with the tech issues were an

6  absolute nightmare, you know, between the technical problems

7  and the translation problems.

8       So I think if you look -- he did attach the second

9  day.  I think you can see it was exactly like the first day.

10 And I don't want to make -- well, I have -- I think there's an

11 aspect of it that is deliberative.  To force me to spend five

12 minutes to ask one question and then to have her come back and

13 say, I don't want to answer it, it's not particularly

14 effective.

15      So the relief I would ask, Judge, is to have a

16 deposition in the courtroom, if necessary, with a special

17 master that can address these issues because nearly every

18 question is objected to, object to the form.  It's all there,

19 and when I get the video to the Court and the translation, I

20 think we'll see that it was -- I didn't have an opportunity to

21 depose this particular party.

22      And, by the way, there were other witnesses in the

23 room.  Mr. Kumar was there as well, and there were conferences

24 as well.  So it was the same thing that happened the first day.

25      THE COURT:  So when do you sense, Mr. McDonnell,

1  you'll have an idea from your interpreter whether there are

2  interpretation issues?

3          MR. McDONNELL:  I will email her as soon as we get

4  off.  I know we sent it -- as soon as we got the video and the

5  transcript, we sent it to her, and I haven't heard a response

6  back.  But I'll try to get that done in the next five days,

7  Judge.

8          THE COURT:  All right.  And then it's my

9  understanding, Mr. Hollander or Mr. Kannenberg -- I don't know

10  which one of you can respond to this -- you're planning on

11  using the same interpreter at the trial, the interpreter that

12  was used for the deposition; is that correct?

13          MR. KANNENBERG:  Casey Kannenberg on behalf of

14  Plaintiff.

15          Yes, Your Honor.  Ms. Schaheen, we are anticipating

16  using her at trial as well as the final pretrial conference on

17  July 8 [sic].

18          And one question we have for the Court so we can make

19  sure that they set aside enough time is, is how much time we

20  think we will need the court reporter services at the July 28

21  final pretrial conference.

22          THE COURT:  Well, since I don't know what your

23  materials look like yet, that's a little hard for me to

24  address.  I know we have two final pretrial conferences that

25  day.

 1          I'm looking at my law clerk to see if he remembers

 2    what --

 3          (Discussion off the record between the Court and the

 4    law clerk.)

 5          THE COURT:  So I think we start you guys at 11:00.  We

 6    don't currently have anything set in the afternoon.  Typically,

 7    they take me an hour.  There's been nothing typical about

 8    anything in this case so far in terms of discovery issues, and

 9    I would anticipate probably an hour and a half to two hours for

10    the final pretrial conference.

11          And, again, I don't have your materials yet, so I

12    don't know how many issues there are going to be.  Once I get

13    your final pretrial order, that might -- once I see that, it

14    could be less, but I don't know without seeing that.

15          So I will just tell you that normally I do them in

16    about an hour, but I just anticipate probably -- you should

17    anticipate an hour and a half to two hours.

18          MR. KANNENBERG:  Thank you, Your Honor.

19          And in responding to Mr. McDonnell, the interpreter,

20    she was the interpreter in the first part of Plaintiff's

21    deposition that occurred in February of 2022.  At no point

22    during that deposition did anyone express on the record any

23    issue with the interpretation services that were provided by

24    Ms. Schaheen.  Mr. McDonnell confirmed on the record that she

25    is a certified court translator.

1        As you'll see in my response, the issues with respect

2   to the delay and in that deposition were all Mr. McDonnell.

3   You'll note that after we got off of the conference with

4   Your Honor on the second day of the continued deposition in

5   which you mentioned, hey, if the Zoom goes out, you might have

6   to put the interpreter back on the phone to finish the

7   deposition, well, it did turn out there was an issue with the

8   Zoom link.

9        And I suggested let's go off the record, fix the

10  technology issue, and proceed so you don't have to use your

11  deposition time doing that, but Mr. McDonnell wanted to spend

12  10 minutes -- 10 pages of deposition transcript rehashing the

13  same arguments that were raised in the conference with

14  Your Honor instead of fixing the problem.

15       At the end of that, we got the interpreter on the

16  phone, and the rest of the deposition continued without any

17  further technological issues.

18       And that's the theme of the deposition:  Delay caused

19  by Mr. McDonnell's tactics.

20       THE COURT:  All right.  Counsel, I will tell you this:

21  I think you're all at fault.  I have never seen a case where I

22  have had this many ongoing discovery issues that -- I think if

23  you guys could get yourselves outside of the case for a minute,

24  you could resolve many of these issues yourselves.

25       I'll give you a prime example.  It is absolutely

1   ridiculous that one of the things I had to talk with you about

2   is the fact that there was beeping going on, and the solution

3   was the most common sense solution possible, which was take the

4   battery out of the alarm that was doing the beeping because it

5   was a low battery.

6          Why none of you came up with that solution on your own

7   is beyond me except I think you're just so entrenched in this

8   case and in your positions that you cannot see outside of that.

9          That needs to stop.  You've got to get this case ready

10  for trial.  Your trial is August 14.  As I told you, Judge

11  Pratt is moving forward with that.  You've got a final pretrial

12  conference with me on July 28.  You've got a lot of work to do.

13  You've got to get yourselves to a point where you can zealously

14  advocate for your clients but then pull yourselves out and come

15  up with practical solutions to some of these issues because we

16  cannot continue this way.  And your trial is going to be a very

17  difficult proposition for everybody if we can't get there.

18         So I'm just telling you that now because I get that

19  you're working for your clients and you're working hard for

20  them, but you also have to be, as officers of the Court,

21  cognizant of the fact that you need to come up with practical

22  solutions to things so that we can move the case forward and

23  not just argue A because the other side is arguing B.

24         I know you don't want to hear that from me, but it's

25  what I'm going to tell you.  And I know Judge Pratt has

 1  listened to a lot of these status conferences and motion

 2  hearings that we've had, and he's concerned about that.  So I'm

 3  just sharing that with you because I don't want you get to a

 4  place where you're down there for trial and we're having all

 5  kinds of needs to send the jury out.  He's not going to want to

 6  do that, he's not going to want to have sidebars, so we are

 7  going to have to think of ways that you can resolve these

 8  issues and only bring the necessary issues to the Court.

 9       All right.  With that, I'm going to end the hearing.

10  As I said, I have another hearing at 11.  I appreciate

11  everybody jumping on the call today.  I know it was quick, but

12  we've got a lot of motions.  I want to try to get them dealt

13  with for you as soon as I can, and I'm working on them.

14       And, as I said, we'll get them out as soon as we can.

15  They may come out in a group order, or they may come out one at

16  a time depending on how we can work quickly to deal with them.

17  So just watch for that, and I'll get that taken care of.

18       So just so everybody knows, July -- I believe our --

19  actually, are we July 27 or 28?  28 for the final pretrial?

20       July 28.  So that means your materials are going to be

21  due to me by no later than the close of business on the 25th.

22  So that's your final pretrial order.

23       As you know, for those of you who have appeared in

24  this court before, our final pretrial order is pretty

25  extensive.  You're going to have to make sure you've got all of

 1   your exhibits listed, all of your witnesses listed.

 2          To the extent that there are exhibits that you haven't

 3   yet seen because they're going to be a part of a deposition

 4   that hasn't occurred, go ahead and list them.  The other side

 5   can just reserve all of their objections if they're not in a

 6   position to indicate what the specific objections are.  But

 7   only do those with regard to the exhibits you have not yet

 8   exchanged and you don't know what they are.

 9          All right.  I will see you in Davenport on the 28th,

10   and if -- hopefully, if you need anything before then, you can

11   reach out to me.  I'm hoping, after this conversation, that's

12   not going to be necessary.  We've got plenty of work on our end

13   to do for you, and we're focused on getting that done, and you

14   certainly have plenty on your end.

15          So, with that --

16          MR. HOLLANDER:  Your Honor, may I -- sorry.  I didn't

17   mean to interrupt.  May I ask two quick clarification

18   questions?

19          THE COURT:  Yes.

20          And just for the court reporter, that's Mr. Hollander.

21          MR. HOLLANDER:  Gary Hollander.

22          Judge Pratt had moved up the jury selection to

23   August 11, that Friday.  Are we back to actually starting on

24   the 14th and no proceedings on the 11th?

25          THE COURT:  I believe that is absolutely correct.

1    I'll double-check that with him, but that's my understanding is

2    he decided -- when he decided to bifurcate it, I think he

3    decided to move the jury selection to the 14th.  But I will

4    verify that, and we will get an email out to you on that.

5              MR. HOLLANDER:  Thank you very much.

6              And the other one is with regard to Mr. Shalabh Kumar,

7    with what an integral part he is with being able to communicate

8    with the plaintiff and how involved he is in the case, I've

9    thought of perhaps withdrawing him as a witness.

10             And I'm not asking Your Honor to spontaneously rule on

11   that.  I'm just asking, if that's what we elect to do, is there

12   a process you would prefer us to use to bring that to your

13   attention?

14             THE COURT:  Well, I guess the question is,

15   Mr. McDonnell, if he's withdrawn as a witness, do you intend to

16   call him?

17             MR. McDONNELL:  I would, Your Honor.  I think he's

18   made some significant admissions in this case that counteract

19   the damage case.  He's a witness, Your Honor.  He answered the

20   interrogatories.  He can't -- he did all the discovery.  He's

21   attended all the medical appointments.

22             THE COURT:  All right.  So, Mr. Hollander, if you

23   decide you don't want to call him, you can simply just notify

24   Mr. McDonnell of that, but Mr. McDonnell would have the right

25   to call him.  And even, you'll see in our final pretrial order,

1   it does allow that.  I realize you haven't done the final

2   pretrial order yet.  He would still have the opportunity, then,

3   to add him to his witness list if you take him off.  So that's

4   kind of where that sits.  Okay?

5           MR. HOLLANDER:  Thank you, Your Honor.

6           THE COURT:  You're welcome.

7           MR. HOLLANDER:  Yes.

8           THE COURT:  Anything further, gentlemen or ladies?

9           All right.  We're in recess.  Thank you.

10          (The hearing concluded at 10:54 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2              I, Chelsey Wheeler, a Certified Shorthand Reporter of

3     the State of Iowa and Federal Official Realtime Court Reporter

4     in and for the United States District Court for the Southern

5     District of Iowa, do hereby certify, pursuant to Title 28,

6     United States Code, Section 753, that the foregoing is a true

7     and correct transcript of the stenographically reported

8     proceedings held in the above-titled matter and that the

9     transcript page format is in conformance with the regulation of

10    the Judicial Conference of the United States.

11             DATED this 24th day of July 2023.

12

13                    /s/ *Chelsey Wheeler*

14                    Chelsey Wheeler
                      Certified Shorthand Reporter
15

16

17

18

19

20

21

22

23

24

25