IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| RAYA NSHEIWAT,<br><br>    Plaintiff,<br><br>vs.<br><br>WALMART, INC.,<br><br>    Defendant. | NO. 3:20-cv-00064-RP-HCA<br><br>**WALMART'S MOTION TO EXCLUDE UNTIMELY DAY IN THE LIFE VIDEO** |

Defendant, Walmart, Inc. (hereinafter referred to as "Walmart"), by and through their undersigned counsel, Law Offices of McDonnell & Associates, P.C., hereby files this Motion to Exclude Plaintiff's Untimely "Day-in-the Life" Video:

1. On October 1, 2020, Walmart propounded its [First] Requests to Produce upon Plaintiff. A copy of the Request to Produce are Attached Hereto as *Exhibit A*.

2. Request No. 1 sought: "Each photograph, map, videotape, drawing, or other representation depicting the scene of the incident described in the Petition, the injuries described in the Petition, or anything else related to Plaintiff's claims in the Petition." *Exhibit A*, REQUEST 1.

3. Despite a clear request for any videotape related to Plaintiff's claims, Plaintiff did not produce the "Day in the Life" video ("DIL Video") prior to the discovery deadline—even after multiple extensions and discovery conferences. *See* Plaintiff's link to Day in the Life Video dated August 3, 2023, *Exhibit B*. A copy of the video file is attached hereto as *Exhibit C*.

4. Plaintiff likewise did not produce the DIL Video prior to her Court-Ordered depositions on June 29-30, 2023 so that Walmart could have had an opportunity to question her about its contents.

5. Imbedded in the DIL Video is footage from a wedding Plaintiff attended before the accident (April, 2018), which supposedly portrays her physical capabilities before the incident.

6. This 2018 wedding footage was not produced at any time in response to Walmart's formal discovery request for relevant video and photographs.

7. The remaining portion of the DIL Video appears to be an edited self-serving professionally produced video containing audio where Plaintiff demonstrates exaggerated pain responses while her sister waits on her.

8. The DIL Video was created on or about July 2-3, 2023, after the close of discovery. In other words, it was deliberately prepared and created to avoid this Court's discovery orders.

9. A DIL Video is a proper subject for discovery and does not fall outside its scope. *Beving v. Union Pac. R.R. Co.*, 2020 U.S. Dist. LEXIS 192852, *6, 2020 WL 6051594 (ordering production of a day in the life video prepared prior to the discovery deadline as a proper subject of discovery).

10. In the Case Management Order governing this case, there was no exception for "Day in the Life Videos," or an order that permitted them to be produced after the discovery deadline.

11. When a day in the life video is permitted, there is a prohibition against allowing "egregious self-serving conduct" to be depicted, as well as scenes showing "[e]xaggerated difficulty in performing ordinary tasks"—as such depictions could present a danger of undue prejudice. *Families Advocate, LLC v. Sanford Clinic North*, 2019 U.S. Dist. LEXIS 100196, *3-4

(D. N.D 2019) (citing *Bannister v. Town of Noble, Oklahoma*, 812 F.2d 1265 (10th Cir. 1987)) Similarly, "conduct that serves little purpose other than to create sympathy for the plaintiff is highly prejudicial." *Id.* (quotation marks and citation omitted and cleaned up).

12.     In *Families Advocate*, the court noted that the 15-minute-long video did not contain audio and simply dispassionately showed scenes from the plaintiff's daily routine. *Id* at *4.

13.     As explained in the seminal case discussing day in the life videos, *Bannister v. Town of Noble, Oklahoma*, *supra*, courts apply four factors: (1) whether the video "fairly represent[s] the facts with respect to the impact of the injuries on the plaintiff's day-to-day activities;" (2) the likelihood that the plaintiff's awareness of being video recorded would cause self-serving behavior, such as "exaggerated difficulty in performing extraordinary tasks" or "conduct that serves little purpose other than to create sympathy;" (3) "the dominating nature of film evidence;" and (4) whether the video "could distract the jury because the benefit of effective cross-examination is lost." *Id.* at 1269-70.

14.     As set forth below, Plaintiff's claims are largely subjective complaints of low back pain. Her objective examinations consistently show normal strength with no muscle or neurological deficits. She has not had surgery and no structural or anatomic deficit explains her subjective complaints.

15.     Applying the first three *Bannister* factors, the video does not fairly demonstrate the actual injury, it is full of self-serving exaggerated behavior, and appears largely performative.

16.     The DIL Video, Exhibit C, (July 2, 2023 section) in this case initially shows: 1) Plaintiff's sister elaborately propping Plaintiff with pillows on a couch (1:00); Plaintiff engaging in an exaggerated response to take medication (1:24), Plaintiff's sister putting on her socks as if she was a paraplegic (1:43); Plaintiff's sister assisting her up off the couch to use a walker while

she grimaces in pain (2:05); Plaintiff going to the toilet with a walker and engaging in performative distress. (3:00). All of these scenes, which include audio, involve exaggerated grimacing and performative demonstrations of pain and reduced mobility.

17. The DIL Video then proceeds to Plaintiff's sister loading her wheelchair into her Mercedes SUV (4:25); Plaintiff grimacing and entering the vehicle in an exaggerated fashion (5:42); Plaintiff sighing in an exaggerated fashion after sitting down in the car (6:34); Plaintiff grimacing and making the sign of the cross before the car trip starts (7:00); expelling air, closing eyes, and gnashing teeth, purportedly because the pain of even riding in a luxury SUV is so severe (7:04-7:28); Plaintiff's sister getting her wheelchair out of the car (7:30); more exaggerated movements while exiting the car to get into the wheelchair (8:00-8:18); the diabetic Plaintiff eating a scone and drinking a large fruit juice drink at Starbucks (8:30-9:00); and then the same exaggerated movements for Plaintiff to get back into the Mercedes (9:03). Plaintiff's sister then goes shopping in a supermarket while Plaintiff waits in the car and engages in additional exaggerated demonstrations of pain in the back seat. (9:30-10:00).

18. Although virtually every moment of the video is performative, one of the most egregiously exaggerated parts of the video occurs during the ride home from the supermarket where Plaintiff demands that her sister pull over onto the shoulder of a highway whereupon she begins crying (without any actual physical tears) and suggesting that she needs to get sick into a plastic bag (which she does not). (10:25-11:51). There are equally performative expressions of pain when she arrives home and sits on the couch while her sister gets a cold towel so that she may mop her brow. (12:00-13:11).

19. From 13:30 to 16:20, the DIL Video becomes a "day in the life" of Plaintiff's sister. Plaintiff's sister walks (and diapers one of ) her four dogs and cooks a massive serving of Spaghetti with meat sauce, which Plaintiff eats. Plaintiff then gets into bed and goes to sleep (16:40). [1]

20. The DIL Video excerpts, July 3, 2023, the following day, are equally performative and exaggerated. They begin with Plaintiff's sister again performing household chores and serving her a bowl of "Lucky Charms." (17:19). The remainder of the video then shows Plaintiff (and her sister) engaging in performative efforts to dress and bath herself (21:20-24:57) and then she eats Macaroni and Cheese and a sandwich prepared by her sister while reclining on a couch in front of the TV (24:57-end).

21. In many respects, this video is more of a "caretaker day in the life video" since the Plaintiff spends most of the video sitting down and engaging in exaggerated pain responses while her sister performs the household tasks.

22. There is no authority permitting a "caretaker" day in the life video, which the DIL Video appears to be. Plaintiff's sister is not a party to the case, nor is she entitled to compensation for assisting her sister.

23. At the time of the initial pretrial conference (July 28, 2023), Plaintiff still had not produced the DIL Video, or a working link to the video. A working video link was not provided until August 3, 2023.

---

[1] While the video is an exaggerated view of her physical capabilities, the DIL Video does demonstrate Plaintiff's noncompliance with any reasonable diabetic dietary restrictions since she is shown eating every type of food a Type II Diabetic should avoid, including a large fruit juice drink, store bought pastries, sugary cereal, bread, and white pasta. *See* Markham Heid & Alisa Hrustic, *15 Foods You Should Avoid If You Have Diabetes*, Prevention.com (Sept. 4, 2018), https://www.prevention.com/food-nutrition/a20511532/foods-to-avoid-with-diabetes/?utm_source=google&utm_medium=cpc&utm_campaign=arb_ga_pre_md_dsa_prog_org_us_a20511532&gclid=EAIaIQobChMIudi_nsKFgQMVa87ICh0pcQXDEAAYASAAEgItPPD_BwE

24.     The first disclosure of the existence of the DIL Video was during Plaintiff's preparation of her portion of the Joint Pretrial Order (July 25, 2023) but the actual video was not produced until August 3, 2023, after the conference—well after the discovery deadline.

25.     Plaintiff has filed no motion seeking leave from this Court's discovery orders to produce the DIL Video after the close of discovery.

26.     Although there is not extensive case law on the timing of when day in the life videos must be produced, cases discussing the production of surveillance video of the plaintiffs consistently require it to be produced before the close of discovery—even if it is couched as "impeachment evidence." *Blair v. Crown Point Resort, Inc.*, 2014 U.S. Dist. LEXIS 71973, *16 (D. Ar. 2014). Calling something a "demonstrative exhibit" does not fundamentally change the nature of the proposed evidence or a party's discovery obligations.

27.     Despite a specific discovery request for video related to the claims, Plaintiff did not produce the DIL Video timely, or on or before the discovery deadline. In fact, Plaintiff did not provide a working link for the video until August 3, 2023, several days after the Final Pretrial Conference. Nor has Plaintiff offered any explanation why such a video could not have been made or produced in the normal course of discovery, or before the Plaintiff's deposition. Scrambling around after the discovery deadline to create new video evidence is not a basis to extend discovery.

28.     Even if Plaintiff had produced the DIL Video before the discovery deadline, it still should be precluded. Most of Plaintiff's scenes are more performative than demonstrative. The remaining scenes simply show the Plaintiff's sister performing tasks for her.

29.     Almost every scene involves Plaintiff demonstrating exaggerated pain responses such as grimaces during movement. She was clearly aware of being videotaped and it was prepared exclusively for trial.

30. The DIL Video is also cumulative. Plaintiff's deposition, which was taken within a week of the DIL Video, was videotaped and shows her sitting on the same couch in her home for an extended period of time and requesting breaks for pain medication. The jury does not need to see additional performative scenes of Plaintiff sitting on her couch or sitting in her car while grimacing or demonstrating subjective pain.

31. Significantly, the Physical Therapist who was sent to Plaintiff's home to evaluate her also expressed the same concern that Plaintiff was exaggerating her disability and called her treating orthopedist at the University of Iowa to advise the treatment team that she appeared to be more capable:

> 10/20/21 3:15 PM. "Received a live call on nurse triage line from Marcus, physical therapist with Unity Point at Home. Marcus was hoping to speak with Devon Anderson, PA or Dr Pugely. Explained I could pass a message along and ask them to return his call. Marcus is interested in their impression on the amount of this patients disability and her prognosis. **He felt on his assessment that the patient was much more capable then she was letting on.** He can be reached at 309-XXX-6014 Rachel Springer, RN."

*See* attached notes as *Exhibit D*. (D-194, p.186) (emphasis added).

32. Plaintiff produced limited physical therapy records in discovery, in no small part because she was almost completely noncompliant, and withdrew all the medical authorizations to obtain these records. To the extent that Plaintiff wishes to demonstrate her functional capabilities, it appears that the actual therapist who travelled to her home to evaluate her needs would be more appropriate evidence than a professionally prepared and edited performative video.

33. The same concern of Plaintiff exaggerating subjective pain responses and overstating her purported disability was also expressed by two additional treating providers, including the initial Physician's Assistant who noted that she was overrating her pain and wore high heels to an examination where she was complaining about difficulties ambulating due to back

pain. See *Exhibit E*, Deposition of John Tyron, PA, T. 50:1-6; 70:19-71:4. Plaintiff consulted with a spine surgeon at Rush Medical in Chicago who also indicated that her subjective pain symptoms could not be explained by her objective findings. See *Exhibit F*, Deposition of Frank Phillips, MD, T. 19:20-20:21 (could heel-toe walk normally while asserting a need for a wheelchair); 27:19-28:23 ("incredible amount of subjective pain with not very much objectively," . . . "dominates their lives in disproportion and there's often multiple non-anatomic reasons they get disk pain.").

34.     In the seminal case discussing "day in the life" videos, *Bannister v. Noble*, 812 F.2d 1265, 1270, (10th Circ. 1987), the court ruled that such videos must be viewed for potential prejudice before presentation to the jury:

> We have held that "the prejudicial effect of a videotape is to be decided on a case by case basis." *Durflinger v. Artiles*, 727 F.2d 888, 894 (10th Cir. 1984). The district court must determine whether the probative value of a particular "Day in the Life" film outweighs the possibility of prejudice in light of the concerns outlined above. The judge should examine a film outside the presence of the jury in order to make this determination. The resulting decision regarding the prejudicial impact of showing the film to the jury is within the discretion of the trial court. *Id.*

35.     While day in the life videos may be helpful in their proper context: "Reality reveals to us that, unfortunately, some day-in-the-life videos are no longer being used for their proper purposes but instead, are being introduced solely for the purpose of eliciting sympathy from the jury." *Thompson v. TRW Auto. U.S., LLC*, 2014 U.S. Dist. LEXIS 80224, *2-3, 2014 WL 2612271 (footnote omitted). While courts recognize that day-in-the-life videos are often appropriate if they merely provide the jury with a true and accurate visual depiction of the plaintiff's daily activities, courts are also careful to exclude them when they go beyond that limited purpose and contain hearsay statements or other elements plainly designed to evoke sympathy or gain an unfair advantage, or when the plaintiff testifies at trial and is capable of presenting the same type of

evidence in the standard method: through her own testimony. *Id.* Thus, day-in-the-life videos present Rule 403 and hearsay concerns that may compel their exclusion from trial. *Id.*

36.  This particular DIL Video is the quintessential performative video warranting preclusion. Even putting aside its untimely production, the probative value of seeing a person using a walker to get around their home is minimal. Most jurors are familiar with a walker and its potential impact on mobility. Indeed, the jurors will see Plaintiff move around the courtroom using a walker. Sitting passively on a couch while a caretaker performs household tasks does not require a video.

37.  If the Court is going to consider permitting even portions of the video being shown, the defense should be provided with all unedited raw footage. Further, the defense should be permitted to take depositions of the videographer and anyone involved in its creation or production. Finally, the defense should be permitted to produce the DIL Video to its medical experts to evaluate and offer additional opinions. Suffice it to say that Plaintiff's "slumped over" side-sitting position appears to be an unusual posture for someone allegedly suffering severe back pain. *See* Ismahan Shire, *The Best and Worst Sitting Positions for Lower Back Pain*, Med. News Today (Aug. 23, 2023), https://www.medicalnewstoday.com/articles/best-sitting-position-for-lower-back-pain.

38.  This Court should also consider this most recent discovery issue in light of Plaintiff's general discovery conduct, which included attending multiple discovery conferences without even advising her adversary or the Court about its intention to drop a last-minute video on its adversary.

39.  Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to

supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added).

40.  Here there is no evidence that the failure to provide the DIL Video was "substantially justified" or "harmless." Plaintiff intentionally prepared the video the day after Plaintiff's deposition, after the close of discovery, with the express intent to ambush her adversary at the time of trial with new videographic evidence. The wedding video has been available since 2018. This Court extended discovery deadlines on multiple occasions. There is no justification for showing up at a final pretrial conference and serving a 28-minute edited Day in the Life video several days later, particularly since Defendant long ago requested any photographic or video information at the inception of this lawsuit.

**WHEREFORE**, Defendant, Walmart, Inc., respectfully request that Plaintiff's Day in the Life Video be excluded in its entirety at trial.

Respectfully submitted,

**LEDERER WESTON CRAIG PLC**

Dated:  August 31, 2023        By /s/ Benjamin M. Weston
Benjamin M. Weston
Alexandra C. Galbraith
4401 Westown Parkway, Suite 212
West Des Moines, IA  50266
Phone: (515) 224-3911
Fax: (515) 224-2698
E-Mail:   bweston@lwclawyers.com
          agalbraith@lwclawyers.com


**McDONNELL & ASSOCIATES, P.C.**

By: */s/ Patrick J. McDonnell*
Patrick J. McDonnell, Esquire
860 First Ave Suite 5B
King of Prussia, PA 19406
Phone:   (610)  337-2087
Fax:     (610)  337-2575
E-Mail:   pmcdonnell@mcda-law.com


**McDONNELL & ASSOCIATES, P.C.**

By: */s/ J. Michael Kvetan*
J. Michael. Kvetan, Esquire
860 First Ave Suite 5B
King of Prussia, PA 19406
Phone:   (610)  337-2087
Fax:     (610)  337-2575
E-Mail:   mkvetan@mcda-law.com

*ATTORNEYS FOR DEFENDANT*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| RAYA NSHEIWAT,<br><br>    Plaintiff,<br><br>vs.<br><br>WALMART, INC.,<br><br>    Defendant. | NO. 3:20-cv-00064-RP-HCA<br><br>**DEFENDANT WALMART INC.'S RESISTANCE TO THIRD PARTY BILL BARKER'S MOTION FOR RECONSIDERATION TO COMPEL COMPLIANCE WITH SUBPOENA** |

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2023, I electronically filed the foregoing with the Clerk of the U.S. District Court for the Southern District of Iowa, Davenport Division, using the ECF system which will send notification of such filing to the following:

Gary P. Hollander
Thomas Hayes
Aronberg Goldgehn Davis & Garmisa
330 N. Wabash Avenue, Suite 1700
Chicago, IL 60611
email: ghollander@agdglaw.com
        thayes@agdglaw.com

Candy K. Pastrnak
Pastrnak Law Firm, P.C.
313 West Third Street
Davenport, IA 52801
email: ckpastrnak@pastrnak.com

Casey C. Kennenberg
Shanizi Law Group, Ltd
518 17th Street, Suite 270
Denver, CO 80202
Email: ckannenberg@sharuzilaw.com

Jeffrey Michael Marks
5 KILDARE COURT
DEERFIELD, IL 60015
Email: jeffreymichaelmarks@gmail.com

Jonathan Feinstein
JMF LAW LLC
721 MASON LANE
LAKE IN THE HILLS, IL 60156
Email: feinsteinjonathan@gmail.com

*ATTORNEYS FOR PLAINTIFF*

12

Stephen T. Fieweger
STEPHEN T. FIEWEGER, P.C.
5157 UTICA RIDGE ROAD
DAVENPORT, IA 52807
563-424-1982
Fax: 563-424-1983
Email: sfieweger@fiewegerlaw.com

*ATTORNEYS FOR EMS & BILL BARKER*

**LEDERER WESTON CRAIG PLC**

Dated: August 31, 2023

By /s/ Benjamin M. Weston
Benjamin M. Weston
4401 Westown Parkway, Suite 212
West Des Moines, IA 50266
Phone: (515) 224-3911
Fax: (515) 224-2698
E-Mail: bweston@lwclawyers.com

*ATTORNEYS FOR DEFENDANT*