IN THE UNITED STATES
DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| RAYA NSHEIWAT,<br><br>Plaintiff,<br><br>vs.<br><br>WALMART, INC.,<br><br>Defendant. | NO. 3:20-cv-00064-RGE-HCA<br><br><br>**PLAINTIFF RAYA NSHEIWAT'S RESISTANCE TO DEFENDANT'S MOTION *IN LIMINE* TO BAR PLAINTIFF'S DAY IN THE LIFE VIDEO** |

Plaintiff, RAYA NSHEIWAT, hereby responds to Defendant's Motion *in Limine* to Bar her Day in the Life Video as follows:

**I. INTRODUCTION**

The Court should deny Defendant's Motion to bar Plaintiff's properly-disclosed Day in the Life video ("DITL video"). Over a period of decades, courts in numerous jurisdictions including supreme courts of various states, have increasingly recognized the intrinsic value of a DITL video as demonstrative evidence to aid a jury's consideration of a plaintiff's injuries. DITL videos are highly relevant, as they visually demonstrate in a few short frames what otherwise might not come across in live testimony—namely, what an injured person truly faces on a day-to-day basis.

Here, the DITL video shows—better than any testimony can—Plaintiff's daily struggles to perform routine tasks because of the injuries she sustained due to Defendant's negligence. The video fairly and accurately reflects a day in Plaintiff's life. Contrary to Defendant's argument, Plaintiff's actions and behavior depicted in the video are consistent with the medical records of her ***treating*** providers, right from the day of the fall at the Walmart store through today. These

1

providers have testified to her severe, debilitating back pain, which greatly inhibits Plaintiff's ability to perform ordinary tasks and engage in activities of daily living without assistance. They have testified that her symptoms will only get worse as she ages, and that due to failure of conservative treatments, she is now a candidate for surgery. Such testimony is synchronous with what is depicted in the video. ***Defendant has failed to provide any evidence (e.g., surveillance video or witness testimony) contradicting the facts shown in the video, and the Court should not grant the relief requested based on Defense counsel's self-serving interpretation of Plaintiff's pain and level of disability as shown in the video.***

While at times the DITL video shows raw, emotional scenes that may cause discomfort to the viewer, this accurately depicts Plaintiff's life now because of Defendant's conduct. Furthermore, the probative value of the DITL video substantially outweighs the danger of *unfair* prejudice. The Court should allow the jury to experience a taste of what it is like for Plaintiff to live on a day-to-day basis due to Defendant's negligent conduct, and Defendant should not be able to shield the jury from the consequences of its actions and conduct. For these reasons and those discussed more fully below, the Court should issue an Order denying Defendant's Motion and allow Plaintiff to show her DITL video to the jury at trial.

## II. PROCEDURAL HISTORY OF DISCLOSURE OF DITL VIDEO

As a threshold matter, Defendant has inaccurately portrayed the disclosure of the DITL video that is the subject of this Motion. On July 7, 2023—the deadline for the parties to exchange their Witness and Exhibit Lists—Plaintiff included the DITL video on its Exhibit List that was provided to Defendant.[1] (Email Correspondence, dated July 7, 2023, and Exhibit List attached thereto, *attached hereto as* Ex. A.) The disclosure of the video was made five days after the video footage

---

[1] Note that Defendant did not comply with this deadline and would not share its Witness and Exhibit lists until weeks later without seeking leave of Court.

was created. On July 18, 2023—before Plaintiff had even received Defendant's *initial* Witness List—Plaintiff sent Defendant an Amended Witness list disclosing the DITL video creator, Gera Lynd. (Email Correspondence, dated July 18, 2023, and Witness List attached thereto, *attached hereto as* Ex. B.)

Plaintiff sent Defendant a link to the DITL video on July 26, 2023. (Email Correspondence, dated July 25, 2023, *attached hereto as* Ex. C.) Defendant did not alert Plaintiff that there may have been an issue with the link to the video—rather, Defendant delayed until the Pre-trial Conference on July 28, 2023, to apprise the Court and Plaintiff that the video link may not have worked for Defendant. Defense counsel thereafter met with Plaintiff's counsel at the law offices of Candy Pastrnak to examine circuit board exhibits but did not otherwise mention the DITL video. Plaintiff re-sent the link to the DITL video on August 3, 2023. (Email Correspondence, dated Aug. 3, 2023, *attached hereto as* Ex. D.) There was thus no delay or surprise from the time the DITL video was created until it was disclosed and provided to Defendant, along with the identity of its creator, Gera Lynd. Defendant filed its Motion *in Limine* to bar the DITL video 54 days from the date the existence of the DITL video was disclosed. It should be noted that, although discovery is closed, with trial not scheduled to commence until February 12, 2024, Plaintiff would be willing to allow Ms. Lynd to sit for a deposition in the coming month(s) regarding the DITL video, should Defendant so desire and should the Court allow it.

### III. LEGAL AUTHORITY

**A. Evidentiary Standards**

Under Iowa law, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Iowa R. Evid. 5.401; *State v. Neiderbach*, 837 N.W.2d 180, 202

(Iowa 2013). Evidence should not be excluded if its probative value is not substantially outweighed by the danger of *unfair* prejudice. Iowa R. Evid. 5.403. Evidence is unfairly prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case." *Neiderbach*, 837 N.W.2d at 202. However, "all powerful evidence is prejudicial to one side. The key is whether the danger of *unfair* prejudice substantially outweighs the evidence's probative value." *Id*. Rule 403 "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is *unfairly prejudicial*." *U.S. v. McCourt*, 468 F.3d 1088, 1092 (8th Cir. 2006) (quoting *U.S. v. Johnson*, 463 F.3d 803 (8th Cir. 2006)) (emphasis added). All these courts have ruled in favor of allowing the DITL video to be shown to the juries.

**B. Admissibility of DITL Videos**

There is a dearth of Iowa case law governing the admissibility of DITL videos. Hence Iowa courts have, among others, relied on the seminal case decided by the Supreme Court of Illinois. The court declared: "viewed in its proper light a so-called "[DITL] Movie" is merely a type of demonstrative evidence. *Cisarik v. Palos Comm. Hosp.*, 579 N.E.2d 873, 874 (Ill. 1991). In that respect, it held that "it is comparable to a still photograph, a graph, a chart, a drawing or a model. . . ." it "has no probative value in itself." *Id*. Rather, the DITL video serves "as a visual aid to the jury in comprehending the verbal testimony of a witness." *Id*.

*Neiderbach*—a criminal case in Iowa—is instructive. There, the court admitted a video and a photograph depicting the ongoing care needed and the long-term effects of injuries sustained by a child because of the defendant's alleged abuse. *State v. Neiderbach*, 837 N.W.2d 180, 201–03 (Iowa 2013). In observing that the video "depicted the ongoing care that he needs and the lasting

effects of his injuries," the court concluded that "[v]ideo evidence is *highly effective*." *Id*. at 203 (emphasis added). The court further noted that "[c]ourts of other jurisdictions have dealt with the issue of the prejudicial nature of [DITL] videos and have frequently admitted them into evidence." *Id*. (citing *Eckman v. Moore*, 876 So.2d 975, 983 (Miss. 2004)).

As the *Neiderbach* court noted, other jurisdictions have had ample opportunity to assess the admissibility of DITL videos, and overwhelmingly permit such videos into the trial record. Illinois first considered the question in *Barenbrugge v. Rich*, 490 N.E. 1368 (1st Dist. 1986). The court there held that a DITL video of a plaintiff in a medical malpractice action was an accurate portrayal of the plaintiff's condition and circumstances, and whose probative value was not questioned, should be admitted. *Id*. at 1375.

The *Velarde* case is also persuasive. There, the court viewed a DITL video of the plaintiff "engaging in ordinary activities, including waking up, eating meals with her family, taking oral medication, dressing, brushing her hair, stripping linens from her bed, loading the clothes washer and dryer, putting on an overcoat, getting into the passenger's seat of a sport utility vehicle, and visiting her mother's house and a grocery market." *Velarde v. Illinois Cent. R.R. Co.*, 820 N.E.2d 37, 50 (Ill. App. 2004). The film at issue also contained many scenes in which "a family member prompts [the plaintiff] or helps [her] in some other way to complete the activity, such as when she is encouraged to take the oral medication, when she is bathing, dressing, getting in and out of the passenger seat of her vehicle, visiting Star bucks and a grocery store." *Id*. The court also noted that throughout the film, the plaintiff "appears anxious and easily confused and she is frequently tearful." *Id*. Furthermore, the film illustrated the impact of the injury "consistent with witness testimony." *Id*. Given the foregoing, the court held that it "is most improbable that the jury was unduly influenced by a film which shows [the plaintiff] engaging in commonplace activities in a

manner that conformed with trial testimony about her injuries and disabilities." *Id*. at 51. In so holding, the court rejected the defendants' "unsubstantiated suggestion that the video may have included exaggerated and self-serving behaviors." *Id*. at 50.

In *Grimes*, the court similarly held that DITL videos are generally admissible if authenticated and relevant. *Grimes v. Employers Mut. Liability Ins. Co. of Wisconsin*, 73 F.R.D. 607, 609 (D. Alaska 1977). The *Grimes* court specifically noted that, although the scenes in the video at issue "were unpleasant, the plaintiff was able to show that the daily activities in the video were typical for the plaintiff, and thus the admission of the video was not unduly prejudicial." *Id*. In *Georgacopolous*, another Illinois case, the court upheld the admissibility of a DITL video which demonstrated a medical malpractice plaintiff undergoing painful physical therapy sessions. *Georgacopolous v. University of Chicago Hospitals and Clinics*, 504 N.E.2d 830, 832 (1st Dist. 1987). The court rejected the defendant's argument that the videotape was prejudicial and cumulative, noting that the tape was "tasteful" and the objectionable therapy session amounted to only a few minutes out of the 19-minute tape. *Id*. at 832–33.

The *Bannister* case cited by Defendant in its Motion supports admission of the DITL video in this case. Specifically, the *Bannister* court held that DITL films "are . . . often desired because films illustrate, better than words, the impact the injury had on the plaintiff's life." *Bannister v. Town of Noble, Oklahoma*, 812 F.2d 1265, 1269 (10th Cir. 1987). The Tenth Circuit ultimately upheld the video at issue in *Bannister* because, as here, it "portrayed the victim's daily routine of 'getting around school, getting into his car, pumping gasoline for his car, and performing several different tasks in his home.'" *Id*. at 1270. The court further found that any potential prejudice implicated in showing the film was "significantly reduced" by the fact that the film's subjects were available for cross-examination at trial. *Id*.

6

In short, the overwhelming majority of courts that have had the occasion to rule on the issue of DITL videos have approved their admissibility. *See, e.g.*, *Ward v. Hester*, 32 Ohio App. 2d 121, 61 Ohio Op. 2d 124, 288 N.E.2d 840 (Allen County 1972), *aff'd*, 36 Ohio St. 2d 38, 65 Ohio Op. 2d 181, 303 N.E.2d 861 (1973), *cert. denied*, 415 U.S. 984, 39 L. Ed. 2d 881, 94 S. Ct. 1577 (1974) (defendant not prejudiced by admission of "Day in the life" film); *DeBiasio v. Illinois Cent. R.R.*, 52 F.3d 678 (7th Cir. Ill. 1995), *reh'g, en banc, denied*, 1995 U.S. App. LEXIS 17511 (7th Cir. Ill. July 17, 1995) *and cert. denied*, 134 L. Ed. 2d 188, 116 S. Ct. 1040 (U.S. 1996) (trial court properly admitted "Day in the life" video depicting daily routine of worker after amputation injury); *Bannister*, 812 F.2d 1265, 22 Fed. R. Evid. Serv. (LCP) 841 (10th Cir. Okla. 1987) ("Day in the life" film properly admitted); *Jones v. City of Los Angeles*, 20 Cal. App. 4th 436, 24 Cal. Rptr. 2d 528, 93 C.D.O.S. 8673, 93 Daily Journal D.A.R. 14949 (2d Dist. 1993) ("Day in the life" video of paraplegic relevant and material); *Cisarik,* 579 N.E.2d 873 (1991) ("Day in the life" motion picture of brain damaged infant admissible on the same basis as photographs); *Arnold v. Burlington N. R. Co.*, 89 Or. App. 245, 748 P.2d 174 (1988), *review denied*, 305 Or. 576, 753 P.2d 1382 (1988) (videotape depicting employee's struggles after leg amputations properly admitted). Indeed, in personal injury cases); *Families Advocate, LLC v. Sanford Clinic North*, 2019 WL 10943310 (D.N.D. June 12, 2019). DITL videos are routinely held to be admissible.

**C. Legal Authority Regarding Timing of Disclosure of Demonstrative Exhibits**

Local Rule 83E(h) provides that "[a] party using a demonstrative aid during a civil or criminal jury trial must, before the demonstrative aid is displayed to the jury, show the demonstrative aid to representatives of all other parties participating in the trial." Irrespective of when they are produced, depictions of a plaintiff's "Day-in-the-Life" are demonstrative in nature, not substantive, and thereby are not subject to the same disclosure requirements as substantive

7

evidence. *Donnellan v. First Student, Inc.*, 891 N.E.2d 463, 475 (Il. App. 2008); *Velarde*, 820 N.E.2d at 47 (noting that it is "clear that day-in-the-life films are considered demonstrative evidence which help jurors understand witness testimony, rather than additional substantive evidence."). In *Velarde*, the court found that a 22-minute DITL video introduced *the day before trial* was allowable because it accurately depicted the plaintiff engaging in commonplace activities in a manner that conformed to her trial testimony about her injuries and disabilities. *Id*. at 51 (emphasis added).

## IV. ARGUMENT

**A. Plaintiff's Condition in the DITL Video is Consistent with the Medical Records in this Case.**

Defendant argues that in the DITL video, Plaintiff exaggerates her pain and overstates her disability. In support of the foregoing argument, Defendant cites to Physician's Assistant John Tryon and Frank Phillips, M.D. However, these two providers were not Plaintiff's treating physicians. Rather, Plaintiff saw these providers only once for short visits, for a second opinion regarding spine surgery (Mr. Tryon almost five years ago). To the contrary, six physicians who comprise Plaintiff's core medical care team describe her symptoms as legitimate and more accurately describe her pain and level of disability.

Simply put, the DITL video accurately portrays Plaintiff's daily struggles with her injury and is consistent with the medical records that will be introduced at trial. For instance, in her clinical encounter with Dr. Andrew Pugely on August 5, 2021, Dr. Pugely notes that "[t]oday patient states her pain is increased with walking, standing, lifting, twisting. She also endorses pain when she coughs or sneezes. She states her back pain is constant and shooting pain down her posterior legs . . . multiple times a week." (*See* Aug. 5, 2021 Encounter Note, *attached hereto as* Ex. E.) Dr. Pugely further noted in this encounter that Plaintiff's "symptoms continue to cause severe pain,

8

decreased function, and significant occupational limitations." (*Id*.) Dr. Pugely also noted that "it has been 3 years since [Plaintiff's] injury, and she has been unable to return to work[. I]t is likely that she will continue to have a high degree of chronic pain the rest of her life. As she continues to age it is also likely that she will continue to worsen and may certainly need additional medical care." (*Id*.)

In another clinical encounter on September 30, 2021 at the Pain Management Clinic at the University of Iowa, it was noted that her providers are "discussing a potential motorized wheelchair which we agree with, given the difficulty of her ability to get around in her current predicament." (*See* Sept. 30, 2021 Encounter Note, *attached hereto as* Ex. F.) Her Pain Management Clinic providers further noted that "[s]he currently is very limited in her ability ambulate and function secondary to her pain." (*Id*.)

Plaintiff returned to see Dr. Pugely and Dr. James Kohler at University of Iowa on April 14, 2022, and it was noted that she was "now at the point where she is wheelchair-bound with the exception of short distances around her house with a walker. She has now [under]gone extensive conservative treatment with previous injections at multiple locations in her back all of which have not provided any relief of symptoms." (*See* Apr. 14, 2022 Encounter Note, *attached hereto as* Ex. G.) It was further noted that "[s]he denies any medication or therapy she has had that has significantly helped her discomfort." (*Id*.) On January 10, 2023, Plaintiff returned to see Dr. Pugely, and he noted that she was "able to stand in clinic with use of chair arms, however this is significantly painful for her." (*See* Jan. 10, 2023 Encounter Note, *attached hereto as* Ex. H.) Given the failure of conservative treatment, Dr. Pugely discussed that surgery would be considered after reviewing updated advanced imaging. (*Id*.) The medical records and purported testimony of Plaintiff's treating providers thus support Plaintiff's level of pain and disability as reflected in the

9

DITL video. These are objective observations by Plaintiff's only medical care team and not subjective observations as claimed by Defendant.

Defendant relies heavily on a note from a Physical Therapist ("Marcus") for the proposition that Plaintiff was exaggerating her pain and was noncompliant with treatment recommendations to support its position that Plaintiff's pain in the DITL video is exaggerated. Defendant is misquoting Marcus. Defendant quotes from a third-party nurse who stated "He felt on his assessment that the patient was much more capable then she was letting on." Marcus apparently wanted to give three therapy sessions per week whereas Plaintiff could handle only one. He never reported that Plaintiff was exaggerating her pain. Defendant's reliance on Marcus' third-party statement is misplaced. Dr. Pugely—Plaintiff's actual treating provider ***(The University of Iowa surgeon who, as of the date of this Resistance, is in the process of scheduling spine surgery in the coming months)***—was asked about the physical therapy records, and specifically whether they reflect that Plaintiff was "exaggerating," and he testified that he does not agree with the statement that she was exaggerating. (Dep. of Dr. Andrew Pugely, 167:10–22, *excerpts attached hereto as* Ex. I). More specifically, Dr. Pugely testified that "there are patients that have levels of pain and certain maneuvers that hurt them, and with time, what they can do with therapy evolves." (*Id*. 168:4–7.) Dr. Pugely flatly rejected the idea that Plaintiff was declining to participate in therapy three times per week, and testified that in his experience it is common for his patients that they "can't always participate in [physical therapy," (*id*. 24:6–20), and that if a patient can only tolerate once a week "that doesn't raise flags for me." (*Id*. 29:5–14.) Simply put, Defendant's citation to non-physician providers to support its argument that Plaintiff has exaggerated her pain complaints and not complied with therapy is contradicted by Plaintiff's treating physician/surgeon.

To the extent the Court should consider treatment provided by a Physical Therapist, the

10

medical records from a provider who actually treated Plaintiff for over five weeks are more relevant. Specifically, Heather Cary, PT, treated Plaintiff for five weeks leading up to her discharge on June 1, 2022, because she "was not showing progression with physical therapy treatment." (Heather Cary Medical Notes, *excerpts attached hereto as* Ex. J.) PT Cary further noted that Plaintiff did not have "any improvements in her overall ability to perform her daily activities. She continues to report debilitating pain." (*Id*.) Last, PT Cary directed Plaintiff to follow up with her physician "to discuss other treatment options, as this is her second attempt at physical therapy treatment without any success." (*Id*.) In short, medical records from actual treating providers who had encounters with Plaintiff multiple times confirm that the pain and disability level depicted in the DITL video is authentic.

It should be no surprise that Defendant's counsel, who relies on select, cherry-picked medical records from non-treating providers, cannot recognize someone who is in genuine pain and discomfort when he views the DITL video through his own subjective lens. During Plaintiff's deposition, Plaintiff frequently experienced sharp back pains, and grimaced in discomfort, as the result of having to sit through extended periods of questioning without being offered a break by Defense counsel. At one point, Plaintiff was grimacing, asking for her sister to come help her, and a medication break was requested—nonetheless, Defense counsel persisted with his examination of the witness without any acknowledgment or consideration of her considerable pain. (Dep. of Raya Nsheiwat, June 30, 2023, 152:1–25, *excerpts attached hereto as* Ex. K.)

Defense counsel's callous indifference to the pain and suffering of others thus persists in his interpretation of the DITL video, as evidenced by his "body shaming" Plaintiff regarding her chosen meals and irrelevant attention to the type of vehicle Plaintiff is seen riding in. The Court should not rely on Defendant's inability to recognize pain and discomfort in considering its

11

Motion, but rather should watch the video and arrive at its own conclusions regarding what is depicted in the video.

**B. The DITL Video Depicts Plaintiff's Ordinary, Day-to-Day Existence Post-Incident.**

Defendant further argues that the DITL is "self-serving" and contains "exaggerated" pain responses to certain activities. However, contrary to Defendant's argument, the DITL video here accurately portrays Plaintiff's day-to-day existence dealing with the injuries she suffered as a result of Defendant's negligent conduct. It is a visual aid to assist the jury in comprehending the testimony of a witness. *Cisarik*, 579 N.E.2d at 874. As such, the video is consistent with the *Bannister* factors outlined in Defendant's Motion.

The first concern noted in the *Bannister* decision is whether the videotape fairly represents the facts with respect to the impact of the injuries on the plaintiff's day-to-day activities. *Bannister*, 812 F.2d at 1269. The court noted that "[a] film depicting the victim in unlikely circumstances or performing improbable tasks cannot be said to fairly portray a typical [DITL] of the victim. The probative value of the film is greatest, and the possibility of prejudice lowest, when the conduct portrayed *is limited to ordinary, day-to-day situations*." *Id*. (emphasis added).

Defendant's Motion itself allays the *Bannister* court's first concern, as it acknowledges that the DITL video depicts Plaintiff in ordinary, day-to-day situations. Specifically, Defendant notes that the video shows Plaintiff sitting on a couch, taking medication, going to the toilet, getting dressed, entering and exiting a vehicle, sitting in a wheelchair, waiting in the vehicle while her sister shops, eating meals, and getting into bed. (Def's Mtn., pp. 4–6.) None of these situations are "unlikely circumstances" or depictions of Plaintiff performing "improbable tasks"—they are ordinary, day-to-day situations.

The second concern in *Bannister* is the potential for a plaintiff being videotaped for litigation to engage in "self-serving behavior, consciously or otherwise." *Bannister*, 812 F.2d at 1269. In raising this concern, the court cited an example of a film reenactment of how the injury occurred, with the plaintiff "entering his position of peril with a look of alarm on the face of his stand-in." *Id*. Those circumstances do not exist in the present video. While the court did note that "[e]xaggerated difficulty in performing ordinary tasks represents a similar danger of prejudice," *id*., as discussed above in Section IV.A, Plaintiff's pain responses and disability depicted in the video are consistent both with the medical records of her *treating* providers.

The *Bannister* court's final concern with DITL videos was "the potential to distract the jury because the benefit of effective cross examination is lost." *Bannister*, 812 F.2d at 1269. However, the court noted that "this difficulty is lessened if the victim can be cross examined at trial regarding the events depicted in the film." *Id*. at 1269–70. Here, the concern is doubly lessened because Plaintiff, the videographer Gera Lynd, and Plaintiff's sister Alia Nsheiwat (who is also depicted in the DITL video) will all be at trial and subject to cross examination.

The *Bannister* court, as the Court should here, ultimately concluded that it was proper for the trial court to admit the DITL video at issue in that case. *Id*. at 1270. In so holding, the Court noted that the video showed the plaintiff "getting around school, getting into his car, pumping gasoline for his car, and performing several different tasks in his home." *Id*. The Court noted that "[a]lthough there are a couple of scenes that show [the plaintiff] conducting activities that he would be unlikely to do frequently, the film as a whole demonstrates [his] adaptation to his injury." *Id*. Similarly, here the DITL video only shows Plaintiff's ordinary, day-to-day existence. If there is any contrast with the *Bannister* case, it is that here the video does not show Plaintiff conducting any activities she is unlikely to do frequently (with perhaps the exception of vomiting after

13

returning from the grocery, prior to which she asked her sister in her native language that the camera be turned off). Thus, there exists a stronger case here for admission of the DITL video as a demonstrative exhibit.

It should further be noted, contrary to Defendant's argument, that the DITL video is not cumulative of other testimony. As the court in *Jones* observed:

> In the case at bar, we discern no abuse of discretion in the trial court's finding the video not cumulative to other testimony. The video best describes the problems Ms. Jones encounters on a daily basis *in a way mere oral testimony may not convey* to jurors. *The video also best demonstrates the everyday problems* a person with paraplegia encounters as a result of an injury of this kind. Moreover, the video is the most effective way to explain to the jury the extent of the assistance and medical attention required as a result of being rendered a paraplegic.

*Jones*, 24 Cal.Rptr.2d at 534 (emphasis added). Similarly, here the DITL video best describes what Plaintiff encounters on a daily basis and the level of assistance she requires. The video is thus not cumulative of any other testimony that may be offered at trial.

Defendant argue the DITL is a "caretaker" video because Plaintiff's sister who provides care for her is featured in the DITL video. This belies common sense. There of course would be family members or caretakers in the DITL video as it is depicting the day in life of Plaintiff. See *Families Advocate, LLC*, 2019 WL 10943310 wherein the DITL video shows the day-in-the-life video which is exactly fifteen minutes long and depicts mostly D.M. and his mother, but it also contains some footage of D.M.'s grandmother and his two younger brothers. *See also Velarde*, 820 N.E.2d 37 (the DITL video shows Lilia's interaction with her mother and other family members).

**C. The DITL Video was Not Belatedly Disclosed**.

Defendant argues in its Motion that the DITL video should be barred because it was not produced in response to its Request for Production No. 1. Defendant, however, misses the point— Plaintiff's DITL video is a demonstrative exhibit subject to the disclosure requirements set forth

in Local Rule 83E. That rule states that "[a] party using a demonstrative aid during a civil or criminal jury trial must, before the demonstrative aid is displayed to the jury, show the demonstrative aid to representatives of all other parties participating in the trial." Demonstrative exhibits are not subject to the same disclosure requirements as substantive evidence. *Donnellan*, 891 N.E.2d at 475; *Velarde*, 820 N.E.2d at 47 (noting that it is "clear that day-in-the-life films are considered demonstrative evidence which help jurors understand witness testimony, rather than additional substantive evidence."). *Importantly, with respect to DITL videos, the purpose of the video is to illustrate Plaintiff's life as close to the time of trial as possible, so it would have made little sense to record her activities in October of 2020 when Defendant propounded its discovery requests. Velarde*, 820 N.E.2d at 48.

Here, the DITL video was created on or around July 2, 2023 for purposes of serving as a trial demonstrative exhibit to aid the jury in understanding witness testimony and was promptly disclosed as part of Plaintiff's Exhibit List on July 7, 2023. (*See supra* Section II). The videographer—Gera Lynd—was disclosed on an Amended Witness List on July 18, 2023, and the final video was sent in an email link to Defendant on July 26, 2023. (*Id*.). While the link apparently did not function, another link with the video was sent on August 3, 2023. (*Id*.) In short, Defendant knew of the existence of the video, its creator, and was provided the link to the video *more than six months prior to the start of trial*. If in *Valerde*, where the DITL video was provided *the day before trial* the DITL was allowed, a video that is provided more than six months prior to the start of trial complies with Local Rule 83E.

In any case, there is no prejudice to Defendant because the videographer, Gera Lynd, has been disclosed as a trial witness and can be cross examined at trial or at deposition if the Court allows (as can Plaintiff) regarding the video's authenticity and the substance of the video. Moreover,

15

given the time between the date of this Response and the trial date, Plaintiff is willing to permit Defendant to take Ms. Lynd's deposition should it be so inclined and should the Court allow it. In short, there is no prejudice to Defendant created by Plaintiff's timely disclosure of its DITL demonstrative exhibit.

**D. The DITL Video Does Not Contain Inadmissible Hearsay**.

Defendant further argues in its Motion that the DITL video contains inadmissible hearsay statements. As an initial matter, the statements within the video are not inadmissible hearsay, as the declarants are expected to testify at trial and will be subject to cross examination. Furthermore, the statements made during the video are not going to be offered to prove the truth of the matter asserted, but rather as part of a demonstrative exhibit to show the jury what Plaintiff's life is like. If Defendant is concerned that statements made in the video may be taken by the jury as more than demonstrative evidence, a limiting instruction from the Court should cure such concern.

To the extent the DITL video does contain hearsay, all of the statements contained within the video qualify under several hearsay exceptions, which exceptions apply regardless of the availability of the declarant of each statement. First, the statements within the tape would qualify as "then existing mental, emotional, or physical conditions," and are therefore admissible under F.R.E. 803(3). Second, the statements within the video possess sufficient guarantees of trustworthiness, the statements are offered as proof of a material fact (damages), the statements are more probative on the issue of damages than the live testimony of all persons in the video, and the interests of justice are best served by the admission of the statements within the video into evidence. See *Grimes*, 73 F.R.D. at 611 (holding that a DITL video depicting a plaintiff's injuries to be admissible under F.R.E. 803(24) [now 807]). Last, it should be noted that any dialogue in the video, which is minimal, was conducted in Jordanian, which the jury will not likely understand.

Accordingly, while the DITL video at issue here does not contain any inadmissible hearsay, to the extent the Court disagrees, any such hearsay would be admissible under recognized exceptions. In addition, if the Court wishes, all audio can be deleted from the DITL video.

**E. Any Raw Footage is Exempt from Production**.

Defendant argues in its Motion that "the defense should be provided with all unedited raw footage." (Def. Mtn, p. 10.) Defendant, however, is not entitled to the raw footage. In *Families Advocate, LLC*, the court entertained a request from the defendant for the raw footage from a DITL video. *Families Advocate, LLC*, 2019 WL 10943310, at *2. The plaintiff objected to the request, arguing that the raw footage was exempt from production pursuant to F.R.C.P. 26(b)(3). *Id*. The court agreed with the plaintiff and held that the raw footage is exempt from production. *Id*. The Court here should similarly decline to order the production of any raw footage pursuant to F.R.C.P. 26(b)(3).

**F. The Court Can Issue a Limiting Instruction if Warranted**.

Plaintiff respectfully requests that the Court take the opportunity to view the video prior to ruling on its admissibility, rather than accept Defendant's inaccurate interpretation of the DITL video. Plaintiff is providing a secure link to the Court as Ex. L. If the Court has any concern after viewing the video, it can issue a limiting instruction to the jury. Alternatively, and although Plaintiff maintains that the video is highly probative and accurate in its depiction of Plaintiff's condition and complies with most all court decisions in practically all jurisdictions in both State and Federal Courts, rather than striking the video in its entirety, Plaintiff would be willing to incorporate any edits to the video that the Court may deem necessary for the video to be admissible. For these reasons, and those discussed more fully above, the Court should issue an Order denying Defendant's Motion *in Limine*.

WHEREFORE, Plaintiff respectfully requests that the Court deny Defendant's Motion *in Limine*, and for any further relief which is just.

Respectfully Submitted.

**RAYA NSHEIWAT, Plaintiff**

By:/s/ *Casey C. Kannenberg*

Casey C. Kannenberg
ckannenberg@sharuzilaw.com
Natalie R. Novak
nnovak@sharuzilaw.com
SHARUZI LAW GROUP, LTD
555 17th St. Ste. 975
Denver, CO 80202
Tel: (303) 226-0330

Gary P. Hollander (ghollander@agdglaw.com)
Thomas J. Hayes (thayes@agdglaw.com)
Aronberg Goldgehn Davis & Garmisa
225 W. Washington St., Ste. 2800
Chicago, Illinois 60606
Telephone: (312) 828-9600
Facsimile: (312) 828-9635

Candy K. Pastrnak
PASTRNAK LAW FIRM, P.C.
313 West Third Street
Davenport, IA 52801
E-mail: ckpastrnak@pastrnak.com

**CERIFICATE OF SERVICE**

      I hereby certify that on September 15, 2023, I electronically filed the foregoing with the Clerk of the U.S. District Court for the Southern District of Iowa, Davenport Division, using the ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Jeffrey Michael Marks<br>ATTORNEY AT LAW, JEFFREY M. MARKS<br>5 KILDARE COURT<br>DEERFIELD, IL 60015<br>312-606-0400<br>Fax: 312-585-5538<br>Email: jeffreymichaelmarks@gmail.com | Jonathan Feinstein<br>JMF LAW LLC<br>721 MASON LANE<br>LAKE IN THE HILLS, IL 60156<br>847-857-8951<br>Email: feinsteinjonathan@gmail.com |
| Benjamin Michael Weston<br>Alexandra Galbraith<br>LEDERER WESTON CRAIG PLC<br>4401 WESTOWN PARKWAY SUITE 212<br>WEST DES MOINES, IA 50266<br>515-224-3911<br>Fax: 515-224-2698<br>Email: bweston@lwclawyers.com<br>Email: AGalbraith@lwclawyers.com | J. Michael Kvetan<br>Patrick McDonnell<br>MCDONNELL & ASSOCIATES, PC<br>860 1ST AVENUE, SUITE 5B<br>KING OF PRUSSIA, PA 19406<br>610-337-2087<br>Fax: 610-337-2575<br>Email: mkvetan@mcda-law.com<br>Email: pmcdonnell@mcda-law.com |
| Stephen T. Fieweger<br>STEPHEN T. FIEWEGER, P.C.<br>5157 UTICA RIDGE ROAD<br>DAVENPORT, IA 52807<br>563-424-1982<br>Fax: 563-424-1983<br>Email: sfieweger@fiewegerlaw.com | Anish Parikh<br>PARIKH LAW GROUP, LLC<br>150 S. WACKER DRIVE, SUITE 2600<br>CHICAGO, IL 60606<br>312-725-3476<br>Email: anish@plgfirm.com |

      I certify under penalty of perjury that the foregoing is true and correct. Executed September 15, 2023, in Denver Colorado.

      By: *Casey C. Kannenberg*
      Casey C. Kannenberg